2015 VT 34

## Michael Obolensky and Jirina Obolensky v. Robert Trombley and Sandra Trombley

[115 A.3d 1016]

No. 13-418

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.**

Opinion Filed February 6, 2015

*Michael N. Obolensky* and *Jirina C. Obolensky*, Pro Se, Brentwood, New York, Plaintiffs-Appellants.

*Sandra L. Trombley* and *Robert A. Trombley*, Pro Se, Brandon, Defendants-Appellees.

¶ 1. **Robinson, J.** Property owners appeal from the superior court's order requiring them to alter what the court deemed to be a "spite fence" located near adjoining property owners' land, and challenge the court's judgment concerning two instances of trespass. We affirm.

## I. Facts

¶ 2. The trial court made the following factual findings in connection with several post-judgment motions in this case. The parties are adjoining property owners in the Town of Brandon. Michael and Jirina Obolensky own forty acres of land, which they purchased in 1995. The Obolenskys operate a bed-and-breakfast in a large Victorian house located at the lower eastern end of the property. Although not directly visible from their house, there is a beautiful view of the mountains from the highest part of the land, accessible by walking from the house uphill through a field. The adjoining property owners are Robert and Sandra Trombley, who purchased 3.7 acres of land in 2004 and built a home on the lot two years later. The Trombleys' lot is at the top of the rise, adjacent to the Obolenskys' field; the Trombleys have a direct view of the mountains. The exterior wall of their house is thirty-seven feet from the common boundary with the Obolenskys at its nearest point.

¶ 3. Soon after the Trombleys built their home, the Obolenskys commissioned a surveyor to conduct a boundary survey. In fall 2007, Mrs. Obolensky placed "no trespassing" signs on a location that she believed (based on the Obolenskys' boundary survey) was within her lot. The signs were placed at a location eight feet within an area also claimed by the Trombleys, who had mowed the lawn in the area. An acrimonious dispute followed, culminating in a call to the police. The police permitted Mr. Trombley to remove the signs that the Obolenskys had placed on the lawn. The

Obolenskys subsequently filed suit to determine the boundary, and also raised claims of trespass.

¶ 4. A criminal charge was filed against Mrs. Obolensky in the fall of 2009 following an incident in which she and guests walked onto the mowed area claimed by the Trombleys, Mrs. Obolensky exposed her backside toward the Trombleys, and a man in her group urinated on the lawn. The charge was dismissed after Mrs. Obolensky successfully completed a diversion program.

¶ 5. On June 30, 2011, the superior court issued an order resolving the underlying case based on the parties' stipulation. Among other things, the stipulated order (1) established an agreed-upon boundary line based on a survey done by the Trombleys' surveyor; (2) called for an independent surveyor to mark the boundary corners; and (3) provided that the parties "shall each be entitled to erect and maintain any fence allowed by law."

¶ 6. The current appeal relates to the trial court's rulings on a host of post-judgment motions arising from subsequent events. We summarize the court's findings concerning those events here, discussing in more detail the findings related to the Obolenskys' claims of error.

¶ 7. First, at 5:30 a.m. a few days after the parties signed the stipulation, a contractor hired by the Obolenskys began the process of building a wooden stockade fence along most of the eastern boundary of the Trombleys' property. That fence stands six feet, one inch tall — the maximum height allowed by the local town ordinance without a permit — and consists of solid narrow wooden pieces fitted snugly together and flush with the ground. It was located on the Obolenskys' property, between three inches and one foot east of the boundary line. The Obolenskys put signs on the fence facing the Trombleys' property reading: "NO TRES-PASSING, POLICE TAKE NOTICE" and "POSTED, PRIVATE PROPERTY." The settlement agreement between the parties allowed for the erection of such signs at designated locations, but two of the signs were placed directly next to each other, in violation of the agreement.

¶ 8. The Obolenskys also had the fencing company place a single-strand barbed wire fence along what they considered to be the common boundary to the north of the Trombleys' property. Mr. Trombley did not believe that the strand correctly marked the line, and in July 2011 the Trombleys' surveyor determined that

the Obolenskys had encroached on the Trombleys' property at their northern boundary line at five points. Mr. Trombley ran a straight string along his northern boundary from the established northwest to the established northeast corners of the property. Mr. Trombley contended that the wire fence placed by the Obolenskys encroached on his land, and the Obolenskys, in turn, claimed that Mr. Trombley cut saplings and brush on their side of the divide.

¶ 9. In the meantime, the Obolenskys planted twenty-two evergreen trees on their property, arrayed from twenty to eighty feet from the Trombley boundary line. The trees range in height from twelve to fifteen feet, and are arranged in roughly three to four rows in a staggered, asymmetric formation. The trees were planted on the high part of their field, in front of the Trombleys' house, obstructing the Trombleys' mountain view. The Trombleys originally objected to the trees, although they later dropped their objection. By May or June 2012, some of the trees were dying or showing damage. The Obolenskys suspected that Mr. Trombley had poisoned the trees.

¶ 10. Finally, because the stockade fence is set back from the boundary line, there is a small strip of the Obolenskys' property on the side of the fence facing the Trombleys' property. The Obolenskys do not mow this narrow strip (and cannot do so without trespassing on the Trombleys' property), and the field grass has grown between three-and-one-half to four inches high in the area. The overgrown grass sometimes flops onto the Trombleys' property.[1] In the summer of 2012, Mr. Trombley, whose property is otherwise highly groomed, cut the grass.

¶ 11. As a result of these activities, the Trombleys filed a post-judgment motion, seeking a declaration that Obolenskys' stockade fence was an unlawful spite fence erected in violation of the underlying order, and an injunction ordering its removal. They also sought damages and injunctive relief for trespass in connection with the wire fence encroaching on the northern boundary of their property, and for damages for trespass by Mrs. Obolensky while she was overseeing the construction of the stockade fence. For their part, the Obolenskys filed multiple motions for contempt

---

[1] This narrow space is reminiscent of the historical problem of "devil's lanes," the "unoccupied spaces between separate fences constructed by hostile neighbors." *Choquette v. Perrault*, 153 Vt. 45, 49, 569 A.2d 455, 457 (1989).

and an amended complaint seeking damages for trespass on account of Mr. Trombley's mowing of the thin strip of tall grass between the fence and his property, for allegedly cutting vegetation and leaving debris on their property to the north of the Trombleys' property, and for allegedly poisoning their newly planted evergreen trees.

¶ 12. The court conducted a site visit, and a hearing was held over multiple days. The court found that the stockade fence, as constructed, was a spite fence, noting that the fence significantly impairs the Trombleys' ability to see the mountains and creates "a sense of confinement and isolation" because it is tall, is made of solid wood, is close to the Trombleys' home, and stands flush to the ground. The court noted that while a fence of identical appearance and height "might provide welcome privacy in an urban environment," in the context of the surrounding open lands and fields it conveys a "feeling of entrapment" on the Trombley side. The stockade fence's placement also allowed grass to grow along the narrow strip between the fence and the boundary, causing an "unsightly" effect. Moreover, because the fence is "flush with the ground where field grass grows," the fence and grass together block water from draining downhill, resulting in water pooling on the Trombleys' lawn during wet periods.

¶ 13. The court discussed the utility of the fence to the Obolenskys, finding it to be limited. The court noted that the fence does block all but the top of the Trombley house from the Obolenskys' view, thereby enhancing privacy. The court also noted, however, that the evergreen trees planted by the Obolenskys on their property serve the same purpose, and will do so more effectively as they grow. The court acknowledged that the stipulated order specifically permitted the Obolenskys to erect a fence, that "everyone knew they planned to do so," and that "[w]hile the trees they planted provide screening, they do not serve the function of marking separation of the two parcels." The court found, however, that "the stockade fence *as erected* — a six-foot high solid barrier that boxed the Trombleys in and created an unsightly obstruction" — was both "much higher than necessary for the purpose of marking the division between the properties" and motivated predominantly by the Obolenskys' purpose of annoying the Trombleys.

¶ 14. In support of the court's conclusion that the predominant purpose of the fence was to annoy, the court considered a number

of factors: (1) the history of hostility between the parties (e.g., the incident in which Mrs. Obolensky exposed her backside to the Trombleys and her guest urinated on the Trombleys' property); (2) the fact that the first act of erecting the fence consisted of noisy weedwhacking at 5:30 a.m. shortly after the stipulation was signed; (3) the placement of the signs on the fence in violation of the terms of the parties' agreement, showing a "deliberate attempt to be provocative"; (4) Mrs. Obolensky's visible presence throughout the erection of the fence, including trespassing on the Trombleys' property despite the terms of the stipulation that had just been signed; (5) the fact that the Obolenskys erected the stockade fence in addition to planting twenty-two evergreen trees, which provided a screen sufficient to provide privacy; (6) the placement of the fence such that neither the Trombleys nor the Obolenskys could maintain the thin strip of grass without trespassing upon the others' land, guaranteeing that the Trombleys would have to look directly at an unsightly thatch of weeds at the base of the stockade fence; and (7) the characteristics of the fence itself, including its height, its solid material, the fact that it was flush to the ground, and its incongruity with the general area.

¶ 15. The court ordered the Obolenskys to reduce the height of the stockade fence to no higher than four-and-one-half feet, leaving at least six inches of space between the ground and the bottom of the fence. The court also ordered the Obolenskys to move their barbed-wire fence on the northern boundary of the Trombley land so that it did not encroach upon the Trombleys' property, and awarded the Trombleys nominal damages of $200 for trespass — $100 for the encroachment by the barbed-wire fence, and $100 for the trespass by Mrs. Obolensky during the erection of the fence. On the basis of the parties' underlying stipulation and ensuing court order authorizing the award of attorney's fees for enforcement of violations of that order, the court also awarded the Trombleys attorney's fees in connection with their two successful claims for trespass, but not with respect to the spite fence.

¶ 16. In connection with the Obolenskys' motions, the court concluded that they had not proven their claims that the Trombleys poisoned their trees or trespassed by cutting saplings and depositing debris on their property by the Trombleys' northern boundary, but that they had proven that Mr. Trombley trespassed by cutting high grass on their property between the

stockade fence and the boundary line. The court determined that the intent to trespass was not willful under the circumstances, and thus did not rise to the level of contempt, but awarded the Obolenskys $100 in nominal damages plus attorney's fees for that trespass.[2] The court's December 3, 2013 final judgment order awarded the Obolenskys $3050 and the Trombleys $2654, so that the Obolenskys were entitled to recover $396 from the Trombleys.

¶ 17. The Obolenskys appeal, principally challenging the court's grant of injunctive relief requiring them to alter their stockade fence. The Obolenskys argue that the court's determination was erroneous because the fence enhances their privacy and was not erected for the sole purpose of annoying the Trombleys; that the court's factual findings were insufficient; that the settlement agreement and the fact that the fence does not violate a zoning ordinance precludes relief; and that the court's reference to 24 V.S.A. § 3801 in connection with its discussion of the fence was inapposite. The Obolenskys further argue that the court erred in rejecting the Obolenskys' motion for contempt, damages, and injunctive relief based on the Trombleys' alleged cutting of vegetation and depositing of debris, that the trial court's ruling that the Obolenskys had not proven that the Trombleys poisoned their trees was based on erroneous findings, and that the court exhibited regional bias. We reject each of the Obolenskys' arguments.

## II. Stockade fence

¶ 18. We review the trial court's decision to grant injunctive relief for abuse of discretion, and we will not set aside factual findings unless there is no credible evidence in the record to support them. *Alberino v. Balch*, 2008 VT 130, ¶ 7, 185 Vt. 589, 969 A.2d 61 (mem).

¶ 19. 24 V.S.A. § 3817 provides:

> A person shall not erect or maintain an unnecessary fence or other structure for the purpose of annoying the owners of adjoining property by obstructing their view or depriving them of light or air. A person who violates a provision of this section shall be fined not more than $100.00.

---

[2] The Trombleys have not cross-appealed this determination.

¶ 20. This "spite-fence" statute was first enacted in 1886 and has remained in substantially the same form since that time. P. Gillies, *Ruminations: A Legal Fence*, Vt. Bar J., Spring 2008, at 13 (citing Laws of 1886, No. 84)). We have interpreted this statute only once, in *Alberino*. In that case, the trial court found that a warped eight-foot plywood fence served no objective purpose other than to annoy a neighbor and was thus a spite fence that had to be removed. 2008 VT 130, ¶¶ 4-6, 10-14. On appeal, this Court considered the argument that if the fence had *any* useful purpose, it could not be said that the *sole* purpose of the fence was to annoy, and thus could not be a spite fence. Acknowledging that some courts apply such a "sole-purpose" test, while others apply a less-arduous "dominant-purpose" test, we did not at that time determine which standard applies in Vermont. See *id.* ¶¶ 9-10. Because the evidence in that case supported the conclusion that the sole purpose of the fence was to annoy the neighbor by obstructing his view, the fence qualified as a spite fence under either standard. *Id.*

### A. Dominant-purpose test versus sole-purpose test

¶ 21. This case calls upon us to answer this threshold legal question that we left unanswered in *Alberino*: does the spite-fence statute require that the purpose of annoying the adjoining property owner be the *sole* purpose of the fence, or merely the *dominant* purpose? We review this question of statutory interpretation de novo. *Wright v. Bradley*, 2006 VT 100, ¶ 6, 180 Vt. 383, 910 A.2d 893.

¶ 22. ■ At least eight states have adopted the "dominant-purpose test" for determining whether the intent element of a spite-fence statute is satisfied. Under this test, "the pertinent question is whether the [defendants'] dominant purpose . . . was to annoy plaintiffs." *Wilson v. Handley*, 119 Cal. Rptr. 2d 263, 272 (Ct. App. 2002). If the defendants' primary purpose in undertaking the project was to beautify property or protect privacy, then the project is not a spite fence, but if the defendants undertook the project "primarily to annoy plaintiffs, and other purposes such as aesthetics and privacy, if any, were only subordinate to the dominant purpose of annoyance," then the necessary intent element is met. *Id.*

¶ 23. All five other New England states follow the dominant-purpose test. *Gallagher v. Dodge*, 48 Conn. 387, 391-93 (1880)

(holding that fence may be spite fence within statute's meaning only if "malicious intent" is "the leading feature of the act"); *Lord v. Langdon*, 39 A. 552, 552 (Me. 1898) ("To entitle the plaintiff to recover, it must be shown that malevolence was the dominant motive, and without which the fence would not have been built or maintained."), *reaffirmed in Peters v. O'Leary*, 2011 ME 106, ¶¶ 16-17, 30 A.3d 825; *Rideout v. Knox*, 19 N.E. 390, 392 (Mass. 1889) ("[W]e are of opinion that it is not enough to satisfy the words of the act that malevolence was one of the motives, but that malevolence must be the dominant motive, — a motive without which the fence would not have been built or maintained."); *Hunt v. Coggin*, 20 A. 250, 250 (N.H. 1890) (upholding jury instruction "that the defendant was liable if he was actuated by two motives, one of annoyance, and the other of utility, if the former was the controlling one"); *Dowdell v. Bloomquist*, 847 A.2d 827, 831 (R.I. 2004) ("In an egregious case such as this, where evidence of malicious intent plainly outweighs the discounted benefit claimed by defendant, the court correctly found defendant's actions to violate the spite fence statute.").[3]

¶ 24. At least nine states, by contrast, have adopted the "sole-purpose test," holding that a structure violates the spite-fence statute or constitutes a private nuisance only where it was built *solely* for the purpose of annoying or inconveniencing neighbors. For example, in *Sundowner, Inc. v. King*, the Supreme Court of Idaho held that its spite-fence rule "is applicable only to structures which serve no useful purpose and are erected for the sole purpose of injuring adjoining property owners." 509 P.2d 785, 787 (Idaho 1973); see also *Fontainebleau Hotel Corp. v. Forty-Five Twenty-Five, Inc.*, 114 So. 2d 357, 359 (Fla. Dist. Ct. App. 1959) ("[W]here a structure serves a useful and beneficial purpose, it does not give rise to a cause of action . . . regardless of the fact that the structure may have been erected partly for spite."), *reaffirmed in Mickel v. Norton*, 69 So. 3d 1081, 1083 (Fla. Dist.

---

[3] See also *Hay v. Stevens*, 530 P.2d 37, 39-40 (Or. 1975) (holding that if fence "unreasonably interferes with plaintiffs' use and enjoyment of their land" and fails balancing test of utility versus harm, it may be enjoinable nuisance notwithstanding fact that some utility exists); *Karasek v. Peier*, 61 P. 33, 36 (Wash. 1900) ("[I]t was not the intention [of the legislature in enacting spite-fence statute] to prohibit the erection of such structures as really enhance the value, usefulness, or enjoyment of land, but such only as are *primarily or solely* intended to injure or annoy an adjoining owner, and which serve no really useful and reasonable purpose" (emphasis added)).

Ct. App. 2011); *Haugen v. Kottas*, 2001 MT 274, ¶¶ 13-14, 37 P.3d 672 (adopting *Sundowner* rule); *Welsh v. Todd*, 133 S.E.2d 171, 173 (N.C. 1963) (holding that "[a] spite fence is one which is of no beneficial use to the owner and which is erected and maintained solely for the purpose of annoying a neighbor" and that there is no actionable claim if fence "does in fact serve any purpose beneficial to the defendants in the legitimate use and enjoyment of their property" or if "defendants erected it in good faith reasonably believing that it would perform a useful function"); *Racich v. Mastrovich*, 273 N.W. 660, 663 (S.D. 1937) (holding that fence may be enjoined only if it provides no "benefit or pleasure" to builder and is built "solely with the malicious motive of injuring the plaintiff by shutting out his light, air, or view").[4]

¶ 25. We join our sister courts of New England in adopting the dominant-purpose test. As the Rhode Island Supreme Court explained, "[t]he very nature of a fence is such that privacy could always be given as the reason for erecting it," even when the evidence shows "egregious," "malicious intent" which "plainly outweighs" any benefit gained by the erector of the fence. *Dowdell*, 847 A.2d at 831. We emphasize, however, that the dominant-purpose test and the sole-purpose test are not far apart in practical terms. Under the test we adopt, a plaintiff still must show that the fence would "strike an ordinary beholder as manifestly erected with a leading purpose to annoy the adjoining owner or occupant in his use of his premises." *Gallagher*, 48 Conn. at 393. This "manifest," "positive," and "leading feature" of the fence must be "so predominating as a motive as to give character to the structure," with any "real usefulness of the structure" being

---

[4] See also *Daniel v. Birmingham Dental Mfg. Co.*, 93 So. 652, 654 (Ala. 1922) (stating that for spite fence to be abatable nuisance, "[i]t should be distinctly alleged, not only that the structure complained of is entirely useless to the respondent, and without value to his property, but also that it was maliciously erected for the purpose of injuring complainant in the use and enjoyment of his property," with "no foundation for any inference of utility or advantage, real or fancied" to defendant) (quotation omitted); *Campbell v. Hammock*, 90 S.E.2d 415, 416 (Ga. 1955) (stating that billboard erected on one's "own land, which is not otherwise a nuisance, does not become one merely because it is erected maliciously or from spite or ill will, where it serves a useful purpose," and that structure is enjoinable nuisance only when erected "maliciously for the sole purpose of injuring another"); *Green v. Schick*, 153 P.2d 821, 821-22 (Okla. 1944) (holding that where fence was built partially because of spite and partially because it was useful, it was not nuisance).

"manifestly subordinate and incidental." *Id.* at 392-93; see also *Hunt*, 20 A. at 250 (stating that motive of annoyance must be "controlling"). In addition, for a fence to be considered a "spite fence" within the meaning of the statute, the plaintiff must show that in the absence of intent to annoy, "the fence would not have been built or maintained." *Lord*, 39 A. at 552; *Rideout*, 19 N.E. at 392 (same). We think that this rule most carefully balances the competing concerns of protection of property rights and the discouragement of pointless inflictions of harm among neighbors.

## B. Factual findings

¶ 26. The Obolenskys challenge a number of the factual findings underlying the trial court's decision. They argue that the court should not have credited Mr. Trombley's testimony that Mrs. Obolensky had referred to the Trombleys as "peasants," that the stockade fence frequently caused water to pool on the Trombleys' property, concerning the incident in which Mrs. Obolensky exposed her backside, or concerning Mrs. Obolensky's trespass onto the Trombleys' property during the fence construction. They argue that this testimony was unsubstantiated or did not make sense, and that the court should have found Mr. Trombley's testimony incredible because he contradicted himself on the question of whether he had questioned Mrs. Obolensky's citizenship status.

¶ 27. ██ To the extent that the Obolenskys challenge the trial court's decision to credit Mr. Trombley's testimony, we emphasize that it is the province of the trial court "to determine the credibility of the witnesses and weigh the persuasiveness of the evidence." *Adams v. Adams*, 2005 VT 4, ¶ 10, 177 Vt. 448, 869 A.2d 124 (quotation omitted). "We will not disturb the trial court's findings of fact unless they are clearly erroneous, despite inconsistencies or substantial evidence to the contrary." *First Congregational Church of Enosburg v. Manley*, 2008 VT 9, ¶ 7, 183 Vt. 574, 946 A.2d 830 (mem.); *Highgate Assocs. v. Merryfield*, 157 Vt. 313, 315, 597 A.2d 1280, 1281 (1991) ("A [factual] finding will not be disturbed merely because it is contradicted by substantial evidence; rather, an appellant must show there is no credible evidence to support the finding."). Moreover, while the Obolenskys complain that much of the findings were based solely on the Trombleys' testimony, it is well-established that a trial court's findings may be based on the testimony of a single witness. We

find no error in the trial court's decision to credit Mr. Trombley's testimony.

¶ 28. The Obolenskys argue more broadly that the trial court erred in finding that the Obolenskys' dominant purpose in erecting the fence was to annoy the Trombleys. The Obolenskys assert that the court's interpretation of the series of events misapprehended the true nature of their conduct and that "the trial court imputes vindictiveness to actions that have a more plausible innocent explanation." The Obolenskys argue that the height of the fence provides the privacy to which they and their guests are legitimately entitled, especially in light of the Trombleys' alleged spying on the Obolenskys.

¶ 29. ■ With respect to the Obolenskys' challenge to the trial court's broader finding that they put up the fence primarily to annoy the Trombleys, we are similarly deferential to the trial court's assessment. The questions of whether a fence is unnecessary, and whether a fence was erected "for the purpose of annoying the owners of adjoining property by obstructing their view or depriving them of light or air," 24 V.S.A. § 3817, are "factual determination[s] to be made by the trial court in the first instance based on the evidence received at trial." *Wilson*, 119 Cal. Rptr. 2d at 272. The question of whether the fence in this case was a spite fence as defined by statute is a mixed question of law and fact, and we will uphold the trial court's conclusion "if the court applied the correct legal standard and its conclusions are supported by its factual findings." *Adams*, 2005 VT 4, ¶ 10.

¶ 30. ■ Here, we find that the evidence admitted at trial supported the trial court's findings and conclusions. The court properly considered the history of intense animosity and conflict between the parties. *Alberino*, 2008 VT 130, ¶ 9 ("The cases are uniform in their approval of reliance on the history of relations between neighbors as evidence of intent to annoy."). There was ample credible evidence to support the finding of the Obelenskys' hostility toward the Trombleys. Moreover, the court properly considered the credibility of the Obolenskys' claimed reasons for building the fence, and the usefulness or uselessness of a fence for purposes of privacy, security, and quiet enjoyment. See *id.* ¶¶ 6-14 (noting that it was proper for trial court to consider fact that fence was "an ugly wall" and that it did not objectively protect defendant's privacy, ward off wandering dogs, or lessen noise of

their barking); accord *Gallager*, 48 Conn. at 393 (considering structure's "character, or location, or use" in determining its leading purpose).

¶ 31. In reaching its conclusion, the court did not improperly ignore the legitimate purposes of the fence identified by the Obolenskys. The court acknowledged that the fence provided them some privacy, although the trees also did so. The court did not credit the Obolenskys' testimony that the fence was necessary to protect them and their guests from the Trombleys' spying, or that it was necessary because Mrs. Obolensky lived in a state of fear of the Trombleys.

¶ 32. We conclude that the trial court's findings with respect to the stockade fence were supported by sufficient evidence, and that its conclusions were supported by its findings.

### C. Effect of settlement agreement, compliance with zoning ordinance, and 24 V.S.A. § 3801

¶ 33. The Obolenskys make several other arguments concerning the stockade fence that warrant discussion. First, they argue that the stipulated court order undermines the trial court's conclusion that this is a spite fence. The parties' settlement agreement provides that the parties "shall each be entitled to erect and maintain any fence allowed by law." They further argue that the fence that they built did not require a town permit, and was thus allowed by law and expressly permitted by the settlement agreement, undermining the finding that the fence was a spite fence.

¶ 34. ██ ██ We disagree. The erection of "unnecessary" structures "for the purpose of annoying the owners of adjoining property by obstructing their view or depriving them of light or air" is expressly disallowed by the spite-fence statute. 24 V.S.A. § 3817. A fence that falls within this category is thus not "allowed by law" as the agreement recites. Although the parties clearly contemplated the possibility of a fence, their agreement did not specify the dimensions, characteristics, or location of any fence, and cannot be construed as an agreement to any fence of any character and dimension at any location, essentially waiving the protections of § 3817. The trial court did not rule that *any* fence

would violate the spite-fence statute; it ruled that the fence here was a spite fence *as erected*.[5]

¶ 35. ▮▮▮ Nor does the fact that the fence did not require a town permit undermine this conclusion. The fact that a structure complies with zoning or permitting ordinances does not preclude a finding that the structure violates a spite-fence statute. *Gertz v. Estes*, 879 N.E.2d 617, 619 (Ind. Ct. App. 2008) (holding that grant of municipal permit for fence did not preclude finding that fence violated spite-fence statute, since local ordinances are subordinate to state law and since statute made no "reference to conformity with local ordinances," showing legislative aim "to address the intent of the builder, irrespective of other government regulation"; see also *Roy v. Woodstock Cmty. Trust, Inc.*, 2013 VT 100A, ¶ 73, 195 Vt. 427, 94 A.3d 530 ("[E]ven a lawfully permitted project may be a nuisance based on its conditions or manner of operation" (quotation omitted)); *Trickett v. Ochs*, 2003 VT 91, ¶ 15, 176 Vt. 89, 838 A.2d 66 (stating that "compliance with the zoning ordinance is of little consequence to the main nuisance issue").

¶ 36. The Obolenskys also argue that the trial court "inappropriately applied" 24 V.S.A. § 3801, a statute relating to fences sufficient to contain livestock. In its discussion of the fence in this case, the trial court made the following statement:

> In determining a reasonable height, it is helpful to refer to Vermont statutory law relating to boundary fences, which establishes a fence of four and one-half feet in height as being a "sufficient" fence. 24 V.S.A. § 3801. This would be a reasonable height that would accomplish the Obolenskys' legitimate purpose [of marking the division between the properties] and would abate the effect of the unnecessary and spiteful height.

The court noted that the statute makes reference to the enclosure of animals, but concluded that the statute does not limit the definition of a "sufficient" fence to such a purpose.

¶ 37. ▮▮▮ The Obolenskys argue that the trial court improperly subjected them to a law directed at livestock owners, which we have held unconstitutional as applied to landowners without live-

---

[5] For the same reason, we reject the argument that the fence cannot be a spite fence because the agreement signed by Mrs. Obolensky in the diversion program in connection with the criminal complaint calls for her to construct a fence.

stock. *Choquette*, 153 Vt. at 54-55, 569 A.2d at 460. We disagree. The trial court did not apply the statute or require the Obolenskys to build a partition fence. It merely used the statute as a reference point for determining a "reasonable height" for a fence serving the legitimate purpose of marking the boundary. It was not improper for the court to consider § 3801, together with all other relevant factors, in determining the height of a reasonable fence under the circumstances.

### III. Other claims

¶ 38. ██ The record also amply supports the court's determination that the Obolenskys failed to prove, by a preponderance of the evidence, that the Trombleys poisoned their trees. The Obolenskys believed that Mr. Trombley had access to road salt because he worked for the state highway department. The Trombleys adamantly denied poisoning the trees. The Obolenskys contacted three arborists, two of whom testified at trial. One arborist testified that trees purchased at nurseries and planted by contractors are often planted too deeply, and that this was the likely cause of the trees' problems. The second arborist testified that he had visited the property, took soil samples around the dying trees, and had them tested in a lab. The results showed no evidence of poisoning. The only evidence of poisoning presented at trial was from a test of a soil sample collected by Mrs. Obolensky herself and sent to a University of Vermont lab for testing. This sample showed salt concentration high enough to interfere with plant growth by drawing water away from the roots. The second arborist testified at trial that the test results from this sample supported the conclusion that the likely cause of death was the application of salt, but emphasized that that conclusion was based on the test results of a sample which he did not collect. Given the conflicting testimony concerning the likely cause of the trees' disease, we find there was no error in the trial court's determination that the Obolenskys failed to prove that the Trombleys had poisoned their trees.

¶ 39. ██ The Obolenskys also claim that the trial court exhibited regional bias against them, noting that the court referred in its written decision to the Obolenskys as New Yorkers who split their time between their Vermont home and New York, and to the Trombleys' longtime employment in Vermont. The

Obolenskys suggest that the court set up a "contrast" between "the Obolenskys as New Yorkers" and "the Trombleys as upstanding Vermont citizens." "We agree that appeals to regional bias are inconsistent with notions of impartial justice," *Brown v. Roadway Express, Inc.*, 169 Vt. 633, 635, 740 A.2d 352, 356 (1999) (mem.), and "take very seriously claims of regional . . . bias in our judicial system," *B & F Land Dev., LLC v. Steinfeld*, 2008 VT 109, ¶ 6, 184 Vt. 624, 966 A.2d 127 (mem.), but we cannot find that the simple recitation of basic background facts on where the parties live or where they are employed, without more, showed any bias on the court's part. The fact that this was a bench trial, rather than a jury trial, diminishes concerns about regional biases. Compare *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 891 (2009) ("All judges take an oath to uphold the Constitution and apply the law impartially, and we trust that they will live up to this promise.") with J. Stein, Stein Closing Arguments § 1:26 (2014-15 ed.) (noting that concerns about bias against out-of-state residents are heightened in jury trials, where counsel's advocacy might engender prejudice).

¶ 40. Finally, we reject the Obolenskys' argument that the trial court erred in declining to find Mr. Trombley in contempt for mowing the narrow strip of grass between the Obolenskys' fence and the boundary line. The court found that the high grass had grown on this three-inch-to-one-foot strip as "a natural consequence of the untenable situation created by the Obolenskys" in building a solid fence flush to the ground in a place where neither party could maintain the area without crossing onto the other's property. The grass thus grew to unsightly lengths and "flopped" onto the Trombleys' land. The court concluded that Mr. Trombley was entitled to cut the grass to the extent that the grass had encroached on his lot, citing *Cobb v. Western Union Telegraph Co.*, 90 Vt. 342, 344, 98 A. 758, 759 (1916) ("[W]here a tree stands wholly on the ground of one and so is his tree, any part of it which overhangs the land of an adjoining owner may be cut off by the latter at the division line."). The court also noted that since even nonencroaching grass would inevitably grow to the point where it would flop onto the Trombleys' land, "it was not unreasonable for the Trombleys to make a preventive cut to prevent such encroachment," instead of being forced to "trim tiny amounts of encroaching growth on an ongoing basis throughout the growing season."

¶ 41. Because the court found that Mr. Trombley had knowingly cut the high grass on the Obolenskys' property, the court found that Mr. Trombley had trespassed. It awarded the Obolenskys nominal damages of $100, as well as attorney's fees associated with that claim. But the court declined to hold Mr. Trombley in contempt of the stipulated order, concluding that "while the act of cutting was willful, the facts do not show a willful intent to violate the terms of the stipulated order." The court found that the Trombleys took reasonable measures to prevent encroachment that was bound to occur by the natural and predictable growth of grass, and that the Obolenskys created the untenable situation in the first place. As noted above, the court also included in its injunction a provision mandating at least a half-foot gap between the ground and the bottom of the fence. This provision was aimed at preventing this problem from recurring.

¶ 42. ▮▮ "[A] civil contempt is one which operates mainly to deprive another party to a suit of some right, benefit, or remedy to which he is entitled under an order of the court." *In re C.W.,* 169 Vt. 512, 517-18, 739 A.2d 1236, 1240 (1999). Contempt is generally a tool used where a party's violation is willful, and coercive measures are necessary to ensure compliance. *Spabile v. Hunt,* 134 Vt. 332, 335, 360 A.2d 51, 52 (1976) (stating that contempt power is "utilized against only that person who, being able to comply, contumaciously disobeys, or refuses to abide by, the court order" (quotation omitted)). "The power of contempt is, in the main, discretionary." *Orr v. Orr,* 122 Vt. 470, 474, 177 A.2d 233, 236 (1962); accord *Spabile,* 134 Vt. at 334, 360 A.2d at 52 ("The power to punish for contempt is necessarily discretionary in nature."). A decision to hold or not hold a party in contempt is reviewed for abuse of discretion. "So long as a reasonable basis for the discretionary action of the trial court is shown to be present, this Court will not interfere." *Brooks v. Brooks,* 131 Vt. 86, 93, 300 A.2d 531, 535 (1973) (quotation marks omitted).

¶ 43. ▮▮ Here, the trial court did not abuse its discretion in declining to hold the Trombleys in contempt. The Trombleys' violation of the stipulated order resulted in only nominal damages, and the court found that the violation was a "natural consequence of the untenable situation created by the Obolenskys." Moreover, the Trombleys had a legal right to cut the overhanging grass,

although not the nonoverhanging grass.[6] Further, the Obolenskys, who were seeking contempt for violation of a stipulated order, had themselves violated it. Under these circumstances, we cannot find that the trial court "failed to exercise its discretion, or that its discretion was exercised on reasons clearly untenable, or to an extent clearly unreasonable." *Id.* at 92, 300 A.2d at 535.[7]

*Affirmed.*

---

[6] The trial court's order did not, as suggested by the Obolenskys, give the Trombleys permission to trespass on the Obolenskys' property indefinitely. The court found that the Trombleys had trespassed, imposed nominal damages for the trespass, awarded the Obolenskys attorney's fees, and issued an injunction designed to prevent the problem from recurring.

[7] The Obolenskys also complain that the trial court failed to rule on the Trombleys' motion to remove the trees, and suggest that the failure to rule on the motion "leave[s] the Obolenskys open to the risk of further litigation by the Trombleys." We disagree. The court's September 26, 2013 decision indicates that the Trombleys dropped their objection to the planting of the trees, rendering the issue moot. Moreover, the court clearly approved of the addition of the trees on the Obolenskys' own property, and indeed partially based its finding that the Obolenskys' stockade fence is an unlawful "spite fence" on the fact that the trees serve a privacy function rendering a tall fence unnecessary or redundant.