NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 116

No. 2015-415

| | |
|---|---|
| Michael J. Regan, Denise Regan and Andree Falardeau | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| Allen Spector, Marcia Spector, Allen Spector Retirement Trust and Town of Fayston | April Term, 2016 |
| | |
| Bruce Chapin and Susie Chapin | |
| | |
| v. | |
| | |
| Allen Spector, Marcia Spector, Allen Spector Retirement Trust and Town of Fayston | |

Mary Miles Teachout, J.

Marc B. Heath of Downs Rachlin Martin, PLLC, Burlington, for Plaintiffs-Appellants Regan.

Joel P. Iannuzzi and Thomas P. Aicher of Cleary, Shahi & Aicher, P.C., Rutland, for
  Defendants-Appellees Spector.

James F. Carroll of English, Carroll & Boe, P.C., Middlebury, for Defendant-Appellee
  Town of Fayston.


PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.     **REIBER, C.J.**   Plaintiffs Michael and Denise Regan appeal from the trial court's decision denying them relief with respect to their complaint alleging that the redirecting of

surface waters by defendant Town of Fayston and defendants Alan and Maria Spector and the Spector Retirement Trust[1] caused ongoing flood damage to their property. We affirm.

¶ 2. The trial court made the following findings, which are supported by substantial evidence. Other than the Town, the parties to the two underlying cases consolidated for trial all own property on a developed hillside in the town. The hillside is dissected by Stagecoach Road, which crosses the upper portion of the hillside, and Farm Road, which curves across the hillside below Stagecoach Road. The Town is responsible for maintaining the two town roads and controlling stormwater drainage on the hillside. The cases concern the impact that activities on the Spectors' land had on properties owned by the downhill neighbors, including the Regans, who own land on the lower side of Stagecoach Road east of the Spectors' land.

¶ 3. During the 1980s, a twenty-three-lot subdivision called Fayston Farms was developed on the hillside between Stagecoach Road and Farm Road. The Spectors became actively involved in the development, at one time owning half of the lots. In 1992, the Spectors purchased three lots, totaling 8.3 acres, which later became the site of their residence just below Stagecoach Road. When the Spectors purchased the lots, culvert #7 was a fifteen-inch culvert that carried stormwater from a portion of the hillside above Stagecoach Road, under the road, and onto the wooded hillside below. Culvert #8, which was located to the west and uphill on Stagecoach Road, drained in a westerly direction. Culverts #6 and #5, which were located further to the east and downhill on Stagecoach Road, drained in an easterly direction. As the trial court stated, the salient factual dispute in the consolidated cases was which direction the stormwater flowed through culvert #7 both before and after it was repositioned in 2004 and then again in 2008.

---

[1] Hereinafter, we refer to Alan and Maria Spector and the Spector Retirement Trust simply as the Spectors.

¶ 4.    The same year that the Spectors purchased the three lots off Stagecoach Road, the Town installed a culvert under Old Stagecoach Road, a farm lane that runs from Stagecoach Road diagonally in a westerly direction downhill below the site of the Spectors' future residence. The Town later installed a stone-lined ditch along the upper edge of Stagecoach Road to manage water draining downhill toward Fayston Farms.  In 1996, the Town required the Spectors to participate in the cost of enlarging the culvert under Old Stagecoach Road when the Spectors sought a permit for a driveway at the location of culvert #7.  The Spectors wanted to move culvert #7 further up the hill to the west, closer to culvert #8, but the town road commissioner did not want to move the culvert further to the west or the east because of concerns that it would increase the flow of stormwater in either direction.  Rather, his strategy was to divert the water under Stagecoach Road at culvert #7 so it would disperse before its volume and speed became a bigger problem downhill.

¶ 5.    In 2004, the Spectors applied for a permit to build a house on Stagecoach Road with driveway access close to culvert #7.  The town road commissioner dug out a box ditch from the outlet of culvert #7 for several feet in an easterly direction.  It sent the flow of water from culvert #7 towards the east approximately fifteen feet, at which point the water was free to run in sheets down the hillside.  When the Spectors built their driveway close to culvert #7, they placed a culvert in the box ditch and covered it with gravel for the driveway to run over it.  The result was that water from above Stagecoach Road flowed through culvert #7 into the box ditch and then turned at almost a ninety-degree angle to proceed through the culvert under the Spectors' driveway toward the east for a distance of fifteen to thirty feet.

¶ 6.    In 2005, the Spectors built a three-story 7100-square-foot house off Stagecoach Road.  Clearing and grading around the house altered the contours of the land.  As a result, erosion problems below the outlet of culvert #7 occurred.  As the trial court found, "[t]here may

have been some shift of water drainage from the west to the east toward the Regan land, but it was not significant and apparently not noticed by anyone."

¶ 7. In 2007, the Regans purchased property adjacent to, downhill, and easterly from the Spectors' property on Stagecoach Road. The Regans' house and driveway is located just off Stagecoach Road, and their property slopes downhill to a wetland area. At the time they purchased their property, the Regans were unaware of a small pond at the bottom of the property that served as a sediment pond for an adjacent pond that had been built by adjoining landowners, Bruce and Susie Chapin, in 2004.

¶ 8. In the summer of 2008, the Spectors did extensive clearcutting of trees on the hillside below their house downhill toward Farm Road. In the fall of that year, the Spectors sought once again to move culvert #7. The new road commissioner, who was concerned that culvert #7 might flow to an identified well site, agreed to move the culvert as long as the Spectors paid for the excavating work. The Town would not have proceeded with the project if the Spectors had not requested it, but as long as the Spectors were willing to pay for it, the Town went along because of its own concerns with culvert #7, including the troublesome maintenance of the box ditch. In October 2008, culvert #7 was expanded to 24 inches and moved approximately 100-150 feet downhill and easterly on Stagecoach Road closer to the Regans' land. When the Regans saw the outlet pipe of culvert #7 directing water toward their land, they protested to the town selectboard, which attempted to mediate a solution by requiring the Spectors to install a stone-lined channel from the end of the outlet to redirect water back toward the Spectors' land.

¶ 9. In May 2009, as the trial court found, "a huge rainstorm occurred with devastating consequences for all parties," including the Spectors, the Regans, and other neighbors downhill from the Spectors' lot. A culvert on the hillside above the Spectors' property plugged, causing large amounts of water to skip over culvert #8, which would have carried the water in a westerly

4

direction, and instead ran along Stagecoach Road through culvert #7. The water continued downhill onto the Spectors' land, plugged up the culvert under Old Stagecoach Road, and gushed down the newly created stone-lined channel causing severe erosion and creating a deep gash. The water continued through the woods in the eastern drainage, eventually entering the Regans' land several feet above their sediment pond. Following this event, the Spectors installed a new stone-lined channel on at least two occasions, but subsequent storms continued to overwhelm the erosion-control device and caused sediment to be brought downhill to the Regans' pond.

¶ 10. There was also significant damage to the properties of downhill neighbors in the western drainage caused by the clearcutting the Spectors had done the previous year. One of those neighbors, Susie Chapin, sued the Spectors and the Town in October 2010. In January 2012, the Regans also sued the Spectors and the Town, alleging trespass and nuisance against the Spectors and inverse condemnation against the Town.[2] The Regans sought an injunction requiring the Spectors and the Town to relocate culvert #7 from where it had been moved in 2008 back to its original location and configuration. They also claimed money damages, but the trial court precluded them from presenting evidence on their damage claim as a discovery sanction. Chapin opposed the Regans' claim for injunctive relief and settled her claim for money damages contingent on culvert #7 remaining in its current location.

¶ 11. At trial, the court heard extensive testimony from various experts with a variety of specialized training and experience. The experts from the opposing parties fundamentally disagreed about whether the water that flowed through old culvert #7 before 2004, and again between 2004 and the fall of 2008 when the culvert was moved 100-150 feet downhill and easterly on Stagecoach Road, drained toward the west or east. The Regans' expert opined that before 2004 water flowing through culvert #7 drained to the west, that the Town's construction

---

[2] Another downhill neighbor joined in the Regans' lawsuit against defendants, but by the time of trial she no longer sought affirmative relief and remained in the case only to participate in any action that might affect her property.

of the box ditch in 2004 significantly changed the storm water flow by sending water from culvert #7 toward the eastern drainage, and that the situation was further exacerbated in 2008 by the relocation of culvert #7 further to the east. The Spectors' expert testified that neither the addition of the box ditch in 2004 nor the relocation of culvert #7 in 2008 had a significant impact on the volume of water flowing into the wetlands region of the Regans' property above their pond. The Town's expert opined that it was impossible to know exactly where water flowed before the box ditch was added in 2004, and he agreed with the Spectors' expert that the relocation of culvert #7 did not significantly change the amount of water affecting the Regans' pond.

¶ 12. The court found that it was virtually impossible to know where water flowed from culvert #7 before 2004, but that the former road commissioner had the best opportunity to observe pre-2004 conditions. The court found credible his testimony that before he installed the box ditch, the water from culvert #7 sheeted out as it went downhill but was directed to some degree to the west by the Old Stagecoach Road culvert. According to the court, the most credible evidence indicated that both before and after 2004, when the box ditch was put in, there was not a single linear path of drainage from culvert #7, but rather some water drained to the west and some water drained to the east. The court could not find that "installation of the box ditch resulted in an all-or-nothing shift of water drainage from west to east, or that there was a linear pattern of drainage exclusively to the west prior to the construction of the box ditch." Moreover, the court found that the relocation of culvert #7 in 2008 "increased the amount of water flowing from above Stagecoach Road through culvert #7 to some degree but not to the degree of being a major shift in direction." The court further found that the road commissioners' decisions in 2004 and 2008 to install a box ditch at culvert #7 and then to move the culvert further east were both reasonable in light of the circumstances at the time.

6

¶ 13. The court also found that mitigation measures installed on the Spectors' land since 2009 "have slowed and dispersed water in the eastern drainage to a very significant degree." The court rejected the Regans' claim of significant damage to their pond, finding that "there has been a marginal increase in the amount of water flowing through culvert #7 in the eastern drainage" and that "much of such flow enters the wetland further to the east of the Regan pond and the amount is not significant." The court explained that the Regans' pond was an artificially-made sediment pond that could be preserved only through ongoing cleaning and maintenance, which the Regans had not done. The court further found, based on expert testimony, that fallen trees such as the Regans had observed were part of the normal processes in a seepage wetland where the pond was located.

¶ 14. Hence, the court concluded that "the conditions on the ground of which Regan complains are due almost entirely to the natural evolution of a seepage wetland that was disturbed by and is incorporating over time the installation of two unnatural and unmaintained ponds." The court further concluded that the box ditch at culvert #7 and the relocation of the culvert had "little, if any, effect on current conditions," and that returning culvert #7 to its original location was "highly unlikely to have positive impact on the Regan pond of any consequence." Given the Regans' failure to prove "any substantial, ongoing injury" attributable to the Spectors or the Town, the court found no need to consider the Regans' claim for inverse condemnation. The court briefly noted, however, that the Town's decisions regarding the location of culvert #7 were part of their duty to maintain roads and drainage systems, and that there was no incursion amounting to an easement on the Regans' land.

¶ 15. On appeal, the Regans argue that the trial court: (1) abused its discretion by imposing a discovery sanction that precluded them from submitting evidence on money damages; (2) applied the wrong legal standard in rejecting their claim of inverse condemnation; and (3) erred in rejecting their nuisance and trespass claims because the Spectors' construction of

7

the stone-lined channel in 2008 constituted an alteration of the pattern of flow within the watershed.

¶ 16. We need not consider the Regans' first claim of error because we are upholding the trial court's decision in favor of the Spectors and the Town as to liability and causation, which, as the Regans' acknowledged at oral argument, moots their claim that the court abused its discretion by precluding evidence of money damages as a discovery sanction. We recognize that the trial court made few findings and conclusions regarding the impact of the Spectors' clearcutting their hillside in 2008, but its findings demonstrate that the clearcutting impacted only the western drainage, and not the eastern drainage in which the Regans' property is located. As noted, the downhill landowner most affected by the clearcutting, Susie Chapin, settled with the Spectors and is not a party to this appeal. The Regans' claim for injunctive relief and money damages centered on the repositioning of culvert #7, which the trial court found to have no significant impact on the land around Regans' pond.

¶ 17. The Regans' second claim of error is that the trial court applied the wrong legal standard in rejecting their inverse condemnation claim against the Town. In their view, the court erroneously applied a "substantial injury" test focusing on the degree of damage to their property rather than the nature and character of the invasion of the property. In making this argument, they rely on two Vermont cases. The first case, Doty v. Village of Johnson, involved a situation in which a portion of the plaintiff landowner's property was flooded periodically after the defendant village raised the height of a dam beyond the benchmark height to which it had a right to maintain the water level. 84 Vt. 15, 77 A. 866 (1910). The injury to the landowner was found to be comparatively slight as measured against what the village would incur if it were required to lower the dam. After noting that the raising of the dam caused the water to periodically cover a portion of the landowner's property, this Court held that "where some degree of injury is shown" and "seems likely to continue, equity will not refuse to interfere because the damage is slight."

8

Id. at 22, 77 A. at 869. The Court held that the landowner was entitled to "at least nominal damages" because the record showed an "invasion of the [landowner's] rights, continuous in its nature, which[,] continued a sufficient length of time under a claim of right[,] may ripen into an easement." Id. at 23, 77 A. at 869.

¶ 18. The second case, Ondovchik Family Ltd. Partnership v. Agency of Transportation, rejected a claim of inverse condemnation that was based on alleged damages caused by a state agency depositing snow on the plaintiff's property when periodically snowplowing the adjacent highway. 2010 VT 35, ¶ 17, 187 Vt. 556, 996 A.2d 1179. In so ruling, this Court relied upon the two-part test established in Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355-56 (Fed. Cir. 2003), for determining when governmental conduct amounts to a potential taking as opposed to a possible tort. Ondovchik Family Ltd. P'ship, 2010 VT 35, ¶¶ 16, 18. Under that test: (1) "a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action"; and (2) "[e]ven where the effects of the government are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners['] right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." Ridge Line, Inc., 346 F.3d at 1355-56 (quotation omitted). In Ondovchik Family Ltd. Partnership, we emphasized that: (1) "temporary, repeated incursions . . . rise to the level of a taking . . . only in instances where the incursions amount to the taking of an easement"; (2) "courts generally find a taking of an easement only when the government requires an 'onerous' dedication of property"; and (3) "[w]hen the intrusion is 'limited and transient' in nature and occurs for legitimate governmental reasons, it does not amount to a taking." 2010 VT 35, ¶ 18.

¶ 19. There is nothing in the trial court's decision indicating that the court failed to follow the law as stated above. The court did not apply a substantial-injury test, but rather noted that it did not need to consider in depth the Regans' inverse condemnation claim because the Regans had failed to prove a "substantial injury potentially warranting equitable relief." To the extent that the court did consider the inverse condemnation claim, it concluded that there was no permanent physical occupation or temporary incursions by the Town amounting to an easement on the Regans' land. The court further concluded that the evidence showed that the substantial cause of the ongoing minor erosion on Regans' land was due almost entirely to the natural evolution of the seepage wetland near the sediment pond rather than any repositioning of culvert #7 on Stagecoach Road. There was ample evidence, including expert testimony, to support the court's findings and conclusions concerning the cause of the condition of the Regans' property near their pond. See Highgate Assocs., Ltd. v. Merryfield, 157 Vt. 313, 315-16, 597 A.2d 1280, 1281-82 (1991) ("Where the trial court has applied the proper legal standard, we will uphold its conclusions of law if reasonably supported by its findings."); see also Obolensky v. Trombley, 2015 VT 34, ¶ 27, 198 Vt. 401, 115 A.3d 1016 (emphasizing that it is province of trial court to determine credibility of witnesses and weigh persuasiveness of evidence).

¶ 20. Finally, the Regans briefly argue that the trial court should have found in their favor on their trespass and nuisance claims due to the Spectors' redirection of the flow of surface water toward their property through construction of the stone-lined channel. In so arguing, they rely upon Canton v. Graniteville Fire District No. 4, where we stated that a property owner "is entitled to have surface water pass to lower lands in its natural condition," but "cannot artificially change the manner of flow by discharging it onto the lower land at a different place from its natural discharge." 171 Vt. 551, 552, 762 A.2d 808, 810 (2000).

¶ 21. We reject this argument because, as noted above, the trial court found by a preponderance of the evidence that: (1) the conditions on the Regans' property of which they

10

complain "are due almost entirely to the natural evolution of a seepage wetland that was disturbed by and is incorporating over time the installation of two unnatural and unmaintained ponds"; (2) "the precise location of the culverts on Stagecoach Road have little, if any, effect on current conditions"; and (3) returning culvert #7 to its original location and configuration, if possible, "would be highly unlikely to have positive impact on the Regan pond of any consequence." The evidence, including expert testimony, supports the court's findings, and those findings support its conclusions. See Merryfield, 157 Vt. at 315-16, 597 A.2d at 1281-82 ("The trial court's findings of fact must stand unless they are clearly erroneous, viewing the supporting evidence in a light most favorable to the prevailing party and excluding the effect of modifying evidence. A finding will not be disturbed merely because it is contradicted by substantial evidence; rather, an appellant must show there is no credible evidence to support the finding." (citations omitted)). While some of the trial court's findings indicate that some sediment was carried down to the area of the Regans' pond through the stone-lined channel during past severe storms, the preponderance of the evidence and the court's findings demonstrate that the condition of the area around the pond of which the Regans complain was almost entirely the result of natural processes and not the repositioning of culvert #7.

Affirmed.


FOR THE COURT:


_____

Chief Justice


11