NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 83

No. 2017-099

| | |
|---|---|
| Eugene W. Beaudoin, Derivatively on Behalf of The New England Expedition Limited Partnership II and The New England Expedition Limited Partnership IV | Supreme Court |
| v. | On Appeal from Superior Court, Chittenden Unit, Civil Division |
| Barry E. Feldman, The New England Expedition-Colchester, LLC and Colchester Managing Member, Inc. | December Term, 2017 |

Robert A. Mello, J.

Catherine A. Shaghalian and Theodore Orson of Providence, Rhode Island, and John T. Sartore, Burlington, for Plaintiffs-Appellees.

Erin Miller Heins of Langrock Sperry & Wool, LLP, Burlington, and Richard Boren of Shechtman Halperin Savage LLP, Pawtucket, Rhode Island, for Defendants-Appellants.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1.     **SKOGLUND, J.**  In this commercial dispute involving the sale of a grocery store, defendants Barry Feldman, the New England Expedition-Colchester, LCC (NEE-Colchester), and Colchester Managing Member, LLC (CMM), ask this Court to strike jury-awarded punitive damages and to find that the trial court erred in numerous evidentiary rulings, in denying defendants' motion for judgment as a matter of law, and in denying defendants' motion for a new trial. For the below-stated reasons, we strike the punitive damages, but affirm the remainder of the trial court's rulings and orders.

¶ 2.    This appeal concerns a commercial dispute over the proceeds from a 2012 sale of a grocery store between plaintiffs—Eugene Beaudoin, the New England Expedition Limited Partnership II (NEELP-II), and the New England Expedition Limited Partnership IV (NEELP-IV)—and defendants.  Prior to the transaction at issue, Feldman and Beaudoin had a sixteen-year business relationship during which they developed commercial properties throughout New England.  In 1993, the parties met and orally agreed to develop supermarkets together.  Based on this oral agreement, the general business agreement and division of responsibility and equity was as follows.  Beaudoin would be responsible for the pre-development elements of each project, including scouting out projects and obtaining the necessary permits and zoning approvals.  Feldman would be responsible for securing financing for each project and then managing the projects after they were completed.  Under this agreement, Beaudoin would receive one-third equity and Feldman would receive two-thirds equity in completed projects.

¶ 3.    Beaudoin and Feldman developed a grocery store in Colchester (the Colchester store) in 1997 or 1998.  The Colchester store was owned by NEE-Colchester, which consisted of three members: NEELP-II with a 49.75% member interest, NEELP-IV with a 49.75% member interest, and CMM with a 0.5% managing-partner interest.  NEELP-II and NEELP-IV each consisted of three partners.  Feldman's wife was a 66% limited partner and Beaudoin was a 33% limited partner in both NEELP-II and NEELP-IV.  Kalfeld Realty II and Kalfeld Realty IV had a 1% general-partnership interest in NEELP-II and NEELP-IV, respectively.  Feldman was the sole shareholder of Kalfeld Realty II, Kalfeld Realty IV, and CMM.

¶ 4.    On December 24, 2012, the Colchester store sold to a third party for $14,500,000.  The net proceeds before distribution were $1,300,000.  Pursuant to the corporate structure explained above, Feldman would have been entitled to two-thirds and Beaudoin to one-third of the proceeds.  However, Feldman distributed 100% of the net proceeds to himself as reimbursement for monthly payments made by Feldman to Beaudoin from 2005 through 2010.  Consequently,

Beaudoin filed suit against Feldman for claims of conversion, breach of fiduciary duty, and unjust enrichment and sought both compensatory and punitive damages.

¶ 5. At trial, the parties did not dispute that Beaudoin received monthly payments between 2005 and 2010. Rather, the core disputed issues at trial were the characterization of these payments as either personal loans or salary for work done, and the events leading up to the sale of the Colchester store, with each party presenting a different explanation to the jury.

¶ 6. Feldman testified that, in 1995, he was approached by Beaudoin who claimed he was in need of financial help to meet his monthly living expenses. Feldman testified that he orally agreed to help Beaudoin as a personal favor and that he paid Beaudoin $7,000 to $30,000 per month from 1995 to 2010. Between 1995 and 2010, Feldman's payments to Beaudoin totaled approximately $2,300,000, with approximately $1,310,000 of those payments made between 2005 and 2010. Feldman testified that, for the years between 2005 and 2010, most of the payments made either by Feldman or by Feldman's wife were recorded on NEELP-II and NEELP-IV tax returns as capital contributions. Feldman told Beaudoin in 2010 that the payments would stop due to the downturn in the economy.

¶ 7. While Beaudoin does not contest receiving these payments, he testified that that he always thought of the payments, which were made by either Feldman or Feldco, Feldman's real estate development company, as compensation for services he rendered to the partnership. He testified that he was unaware of Feldman's characterization of the payments as capital contributions because, notwithstanding Feldman's obligations under the NEELP-II and NEELP-IV partnership agreements to provide copies of the partnership tax returns to Beaudoin, Feldman never did.

¶ 8. After the payments stopped in 2010, Beaudoin sought a buyout of his ownership interest in various projects that he had developed with Feldman, including the Colchester store. Feldman prepared a chart of stabilized values of all the jointly owned real estate which showed a

3

total outstanding debt on the Colchester store of $13,960,000 as of October 2010. At this point in time, Beaudoin described his relationship with Feldman as amicable. However, after October 2010, the parties' relationship deteriorated to the point that both parties obtained legal counsel. In December 2011, Feldman gave Beaudoin a second revised chart reflecting the values of the same real estate referenced in the October 2010 chart. The chart reflected a new debt of $1,790,000 on the Colchester store, with a footnote explaining that the debt was owed to Feldman and accounted "for only those payments made by [Feldman] to [Beaudoin] over the last 10 years, ending in May 2010, which [Beaudoin] took as monthly self-employment earnings." Beaudoin testified that, because he was concerned about this new debt, he requested, through his counsel, to be kept abreast of the details of the Colchester store sale but was not informed until after the closing that the sale had been completed.

¶ 9.     Both prior to trial and during trial, the court made various evidentiary rulings that Feldman challenges here. First, Beaudoin proffered evidence demonstrating that Feldman sold another property that the parties jointly owned in Rhode Island (Rhode Island store) in May 2016 without notice to Beaudoin. The evidence showed that the sale was in violation of a Rhode Island court order requiring Feldman to provide Beaudoin with advance notice of the sale and that Feldman was ultimately held in contempt as a result of the failure to notify. The Rhode Island court found that Feldman should have informed Beaudoin of the sale but made no determination that Feldman converted, misappropriated, or did anything else inappropriate with the proceeds of the Rhode Island sale. Beaudoin offered the evidence of the "incredibly similar" situation to help the jury infer that Feldman's actions around the Colchester store were deliberate, malicious, and in bad faith. Feldman objected to the admission of the Rhode Island store sale and contempt order evidence both through a motion in limine and at trial and, in the alternative, sought a limiting instruction. The trial court admitted the evidence and instructed the jury to consider the evidence only to determine whether "Feldman acted intentionally, in bad faith, or with malice by

4

fraudulently converting proceeds from the [Colchester store] sale that rightfully belong to [Beaudoin] and whether punitive damages are, therefore, appropriate."

¶ 10. Second, prior to trial, Beaudoin filed a motion in limine to exclude evidence of his federal tax returns from the years 1995 to 2004 (pre-2005 tax returns). He argued that they were inadmissible character evidence under Vermont Rule of Evidence 404(b). Feldman suggested that he sought to offer the pre-2005 tax returns to show that Beaudoin either failed to report income or underreported income to the Internal Revenue Service. He argued that the pre-2005 tax returns were relevant and admissible for impeachment purposes and for the substantive purpose of showing how the payments to Beaudoin were characterized by Beaudoin during those years and how much he was paid. After a hearing on the motion, the trial court granted Beaudoin's motion and excluded the pre-2005 tax returns because they were not relevant to the issues at trial: "whether the 2005-2010 payments from Feldman to Beaudoin were properly construed as loans or as salary." The trial court also agreed with Beaudoin that the tax returns, if used for impeachment purposes, were impermissible extrinsic evidence. The court reaffirmed its decision to exclude the evidence at trial upon Feldman's renewed objection.

¶ 11. Third, Beaudoin introduced evidence of Feldman's other real estate development projects in Boston and New York through Feldman's testimony as an adverse witness. Feldman objected, arguing that the evidence was not relevant to the current issues. The trial court found the evidence to be relevant to Beaudoin's experience in development and thus permitted it, but it limited Beaudoin's inquiry to the size and scope of the other projects. Feldman expressed concern over the fact that several of these projects had been abandoned and were no longer being developed. Feldman's counsel could have but did not clarify the status of each project during cross-examination.

¶ 12. Fourth, at the close of Beaudoin's evidence, Feldman moved for judgment as a matter of law, arguing that Beaudoin failed to join allegedly indispensable parties to the lawsuit,

5

including Feldman's wife, Kalfeld Realty II, and Kalfeld Realty IV, all partners to the transaction. The trial court denied the motion, noting that whether any of the three parties "could have been joined or should have been joined [was] really not the issue. The real issue [was] whether [Beaudoin] has presented evidence upon which a jury could return a verdict in favor of [Beaudoin] against the defendants named."

¶ 13. Fifth, during closing arguments, Beaudoin's counsel said, "Put yourself in his shoes. Say to yourself if I was [Beaudoin], what would I do? Would I be upset? Would I feel I was treated unfairly?" Feldman objected, and the trial court sustained the objection and responded with a curative instruction: "Yes. Ask them to put themselves in the same position."[1] Beaudoin's counsel handed the jury a verdict form filled out with the full amount of requested damages. Again, Feldman objected, and the trial court gave another curative instruction: "So ladies and gentlemen, a decision about your verdict is for you to make. This is only arguments by counsel. The evidence is what you've heard from the witness stand and the law is what I will tell you the law is."

¶ 14. After hearing all the evidence and closing arguments, the jury determined that Feldman had converted Beaudoin's share of the Colchester-store sale proceeds, that he breached his fiduciary duty to Beaudoin, and that he was unjustly enriched by the sale. As a result, they awarded $432,300 in compensatory damages and $250,000 in punitive damages to Beaudoin.

¶ 15. Feldman appeals, arguing that the trial court: (1) erred by allowing the jury to consider punitive damages in this commercial dispute; (2) abused its discretion by allowing Beaudoin to introduce evidence of the Rhode Island contempt order; (3) abused its discretion by excluding evidence of Beaudoin's pre-2005 tax returns; (4) abused its discretion by admitting

---

[1] As explained further below, there is some contention over whether the transcript accurately reflects the curative instruction the trial court actually gave—the transcript seems to overrule the objection and reaffirm, instead of correct, Beaudoin's counsel's statement.

evidence of Feldman's additional real estate projects; (5) erred by denying Feldman's motion for judgment as a matter of law for Beaudoin's failure to join allegedly indispensable parties; and (6) erred in denying Feldman's motion for a new trial after Beaudoin's counsel's closing statement remarks. We address each issue in turn.

## I. Punitive Damages

¶ 16. Feldman argues that the trial court erred by allowing the jury to consider punitive damages in this commercial dispute. Beaudoin asserts that Feldman did not properly preserve this argument for appellate review. In order to preserve an objection to jury instructions for appellate review, Vermont Rule of Civil Procedure 51(b) requires that a "party object[] thereto either at a charge conference or before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Beaudoin argues Feldman did not object at the charge conference or before the jury retired, and thus this issue was not properly preserved for our review. Feldman, on the other hand, argues that the issue was properly preserved, as Beaudoin's argument inaccurately describes the issue Feldman raised at trial and raises here. Feldman asserts that the error he objected to and appeals now was not that the content of the jury instructions regarding punitive damages was incorrect, but instead that it was the question of whether punitive damages, as a matter of law, should have been brought to the jury in the first place. And therefore, Feldman argues, his motion for judgment as a matter of law under Vermont Rule of Civil Procedure 50(a) and renewed motion for judgment as a matter of law under Vermont Rule of Civil Procedure 50(b) preserved the issue of whether punitive damages should have been put in front of the jury.

¶ 17. When considering a past case with practically identical procedural history, this Court held that, even where a party failed to object to jury instructions pursuant Rule 51(b), it properly preserved its claim "that the trial court erred in submitting plaintiffs' demand for punitive damages to the jury" by seeking judgment as a matter of law in compliance with Rule 50(a) and

7

renewing its motion after entry of the judgment as required by Rule 50(b). Murphy v. Stowe Club Highlands, 171 Vt. 144, 154, 761 A.2d 688, 695-96 (2000). Here, Feldman did just that—during trial, he sought judgment as a matter of law claiming that there was insufficient evidence to support the punitive-damages claim under V.R.C.P. 50(a), and then properly renewed his motion after judgment was entered under V.R.C.P. 50(b). Because Feldman challenges the presentation of punitive damages to the jury in the first place rather than the substance of the punitive-damages instruction ultimately given to the jury, Feldman properly preserved his claim for appellate review by complying with V.R.C.P. 50(a) and (b), regardless of "whether or not [he] also objected to the jury instruction." Id. See also Wolf v. Yamin, 295 F.3d 303, 308 (2d Cir. 2002) (finding party preserved argument through motion for judgment as matter of law, which "challenged not the substance of the instructions on punitive damages but the sufficiency of the evidence supporting such an award," without making timely objection to jury instructions because "whether the jury instructions were proper and whether [the party]'s objection to those instructions was timely are irrelevant to the question whether [opposing party] sustained his burden of proof by presenting evidence on each element of his claim" for punitive damages).

¶ 18. The issue preserved, we address Feldman's claim that the trial court erred by allowing the jury to consider punitive damages in this commercial dispute. In Vermont, "[p]unitive damages are reserved for especially egregious conduct," and thus the party seeking them must overcome a very high standard of proof. Connors v. Dartmouth Hitchcock Med. Ctr., 12 F. Supp. 3d 688, 695 (D. Vt. 2014). "[T]he purpose of punitive damages is to punish conduct that is morally culpable to the degree of outrage frequently associated with crime." Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc., 2010 VT 33, ¶ 19, 187 Vt. 541, 996 A.2d 1167 (citing Brueckner v. Norwich Univ., 169 Vt. 118, 129, 730 A.2d 1086, 1095 (1999)). An award of punitive damages requires a showing of two essential elements—"wrongful conduct that is outrageously reprehensible" and "malice, defined variously as bad motive, ill will, personal spite

8

or hatred, reckless disregard, and the like." Id. ¶ 18. The "conduct need not only be wrongful, but truly reprehensible," and malice must be proven by "some showing of bad motive." Id. ¶ 19 (quotation omitted and emphasis added). The evidence presented at trial and cited in the trial court's findings when denying Feldman's motion for judgment as a matter of law cannot sustain an award of punitive damages as they do not reflect behavior that satisfies the high bar set by this Court.

¶ 19.    First, Feldman testified that he believed that he had the right to reimburse himself for the payments he made to Beaudoin. The evidence showed that Feldman provided Beaudoin with notice of the disputed debt at least one year before the Colchester-store sale. Beaudoin admitted to receiving notice of the debt but claimed he lacked information of the specific nature of the debt. It is also clear from the record that Feldman concluded the Colchester-store sale without notice to Beaudoin. However, while Feldman's action may have been intentional, the evidence does not suggest that Feldman deliberately hid a plan to repay himself for the payments he understood as loans, for he provided notice to Beaudoin of such debt and the alleged debt was discussed in connection with the sale. Beaudoin was provided with a copy of the purchase-and-sales agreement for the Colchester store in December. Through his attorneys, questions were raised about Feldman's classification of the payments made to him as a "loan" and credited against the Colchester property. Feldman's belief that he was owed the money and sought to reimburse himself may have been wrong, but it was hardly malicious. See, e.g., Meadowbrook Condo. Ass'n v. S. Burlington Realty Corp., 152 Vt. 16, 28, 565 A.2d 238, 245 (1989) (striking punitive damages finding even willful violation of consumer protection statute could not, in and of itself, support punitive damages because conduct "did not evince the degree of malice required"). And, "actionable misconduct alone, however wrongful, cannot sustain punitive damages without the additional element of malice." Fly Fish Vermont, 2010 VT 33, ¶ 20 (quotation omitted). This was a dispute between two businessmen. Not every claim of bad faith, conversion, or breach of

9

fiduciary duty warrants a punitive-damages award. The dispute must result in behavior that is truly reprehensible or egregiously awful. The evidence in this case did not rise to that level.

¶ 20. Second, while Beaudoin asserts that the Rhode Island contempt order satisfies the requirement for a showing that Feldman acted with bad intentions, the underlying behavior cannot be said to be utterly reprehensible, egregious, or patently outrageous, and thus cannot support punitive damages. As noted, the contempt order resulted from a failure to provide prior notice of a pending sale, not for any inappropriate dealings concerning the sale. In Fly Fish Vermont, this Court cited several cases in which we "upheld punitive damage awards on proof of patently outrageous misconduct that also included either an element of bad motive by definition, or were otherwise accompanied by demonstrable malice." Id. ¶ 22. For example, in DeYoung v. Ruggiero, this Court found punitive damages were appropriate where a lawyer fraudulently misappropriated a widowed client's money and then lied about it and denied the theft for years to avoid discovery.[2] 2009 VT 9, ¶¶ 29-30, 185 Vt. 267, 971 A.2d 627. In Shahi v. Madden, we held that punitive damages were appropriate and not excessive because the "defendant waged a campaign of terror against plaintiffs motivated in part by sectarian and racial bias," which is conduct "among the most invidious and reprehensible known to our society." 2008 VT 25, ¶ 26, 183 Vt. 320, 949 A.2d 1022. And, in Pion v. Bean, the Court found behavior, which included repetitive verbal harassment, intentional trespass, and overt destruction of property, satisfied the high bar of egregious behavior needed to support punitive damages. 2003 VT 79, ¶ 42, 176 Vt. 1, 833 A.2d

---

[2] In DeYoung, this Court also noted that "malice may arise from deliberate and outrageous conduct aimed at securing financial gain or some other advantage at another's expense, even if the motivation underlying the outrageous conduct is to benefit oneself rather than harm another." 2009 VT 9, ¶ 27. One may be inclined to apply this reasoning here to find Feldman's conduct supports punitive damages. However, in DeYoung, the securing of financial gain at another's expense alone did not satisfy the deliberate and outrageous conduct element. "The defendant in DeYoung intentionally misappropriated money from a widowed plaintiff and lied about it, conduct sufficient to establish malice through bad motive." Fly Fish Vermont, 2010 VT 33, ¶ 29 (describing Court's reasoning when holding that conduct in DeYoung supported punitive damages). Here, Feldman simply converted funds from a commercial transaction.

1248. Our precedent demonstrates that the behavior underlying punitive damages must be more than merely wrong or even illegal.

¶ 21. While Feldman's conduct may have been wrongful, intentional, and even actionable—as evidenced by the conversion, unjust enrichment, and breach of fiduciary duty judgments against him—as a matter of law, it falls short of the type of egregious behavior this Court has found to support punitive damages in the past. Beaudoin knew the sale of the Colchester property was pending and that Feldman intended to include what Feldman considered a "loan" to Beaudoin in the disbursements of the proceeds. This conduct on the part of Feldman resulted in a meritorious suit for damages. However, the record before this Court "cannot support a punitive award given the absence of outrageously reprehensible conduct and the lack of actual or legal malice towards" Beaudoin. Fly Fish Vermont, 2010 VT 33, ¶ 17. The trial court erred when it submitted the question of punitive damages to the jury because there was insufficient evidence to support it, and thus this Court must strike the punitive damages awarded by the jury.

## II. Evidentiary Rulings

¶ 22. Feldman challenges several of the trial court's evidentiary rulings on appeal, making various arguments as to why some evidence should have been admitted and some should have been excluded. We summarize our standard of review and the relevant law prior to analyzing the individual rulings being appealed.

¶ 23. "[T]rial courts enjoy broad discretion in the admission or exclusion of evidence, and we review those decisions for an abuse of that discretion." Brown v. State, 2018 VT 1, ¶ 20, __ Vt. __, 182 A.3d 597; see also Southface Condo. Owners Ass'n v. Southface Condo. Ass'n, 169 Vt. 243, 249, 733 A.2d 55, 60 (1999) ("Trial courts have broad discretion in ruling on the relevance and admissibility of evidence, reversible only for abuse of that discretion."); Haynes v. Golub Corp., 166 Vt. 228, 236, 692 A.2d 377, 381 (1997) ("The trial court has broad discretion in determining the relevance of any evidence."). "Generally, the trial court's discretionary ruling

11

will be upheld where there is some indication . . . that the court actually engaged in the balancing test and exercised its discretion under V.R.E. 403." State v. Longley, 2007 VT 101, ¶ 18, 182 Vt. 452, 939 A.2d 1028 (quotation omitted). This Court "will reverse the trial court's decision only when we find an abuse of discretion resulting in prejudice." State v. Mead, 2012 VT 36, ¶ 36, 192 Vt. 1, 54 A.3d 485.

¶ 24. Generally, for evidence to be relevant and admissible under Vermont Rule of Evidence 401, it must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." If evidence is not relevant under this relatively broad standard, it is not admissible. V.R.E. 402. However, not all relevant evidence is admissible. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." V.R.E. 403. Further, even after determining that evidence should be admissible under Rule 403, a trial court may exclude evidence under several other rules, including the rule excluding impermissible character evidence. See V.R.E. 404. The general rule is that "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion," V.R.E. 404(a), though Rule 404 allows several exceptions to this rule. V.R.E. 404(b). One of the exceptions under Rule 404 is for other crimes, wrongs, or acts. While evidence of these are "not admissible to prove the character of a person in order to show that he acted in conformity therewith," the evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." V.R.E. 404(b).

A. Evidence of the Rhode Island Contempt Order

¶ 25. First, Feldman argues that the trial court abused its discretion by denying his motion in limine and allowing Beaudoin to introduce evidence of the contempt proceeding surrounding

12

the Rhode Island store. He contends that the evidence should have been excluded (1) as irrelevant under Rule 402; (2) as unduly prejudicial under Rule 403; or (3) as impermissible character evidence under Rule 404.

¶ 26. Feldman posits that the Rhode Island contempt order was not relevant to the claims being tried in Vermont because the Rhode Island case had "different corporate defendants, who were not parties to the Vermont proceeding, and the claims in the lawsuit centered" in Rhode Island "had nothing to do with the claims in Vermont" and because the Rhode Island case occurred several years after the incidents giving rise to the current action. Beaudoin, on the other hand, argued below and argues here that this is a distinction without a difference because, although the corporations had different names, the Rhode Island case and the instant case were ultimately between Feldman and Beaudoin. Beaudoin also emphasized the "remarkably similar nature" of the underlying facts of the cases.

¶ 27. In its order on the motion in limine, the trial court agreed with Beaudoin that the evidence of the Rhode Island contempt order was relevant under Rule 402, noting that the Rhode Island litigation "involved the same two people who are parties to this suit" and discussing the other similarities between the case at bar and the Rhode Island case, both in which "Feldman closed on the sale [of co-owned stores] without informing Beaudoin." Further, it noted that, even though the Rhode Island court made no determination that Feldman misappropriated the proceeds of the Rhode Island store, "[t]he Rhode Island contempt proceeding does tend to demonstrate that Feldman had the intent to illegally convert the Vermont assets, and that he had the requisite malice for punitive damages." Notwithstanding our holding that punitive damages should not have been charged to the jury, the admission of this evidence was not error as explained below. The jury was entitled to consider it in deciding the questions properly before it.

¶ 28. Feldman also argues that, even if the evidence was relevant, it should have been excluded as unduly prejudicial under Rule 403 because it has the potential to create significant

13

prejudice and confusion of the issues. He further contends that Beaudoin's counsel intentionally used the evidence to create confusion at trial. In its order on the motion in limine, the trial court conducted a Rule 403 analysis, balancing the prejudicial effect against the probative value of the evidence. It found that the probative value was incredibly high based on the striking similarity of the situations and parties. It concluded that, while the evidence was unquestionably prejudicial to Feldman—as with all prior bad acts—the evidence "does not 'substantially outweigh' the probative value." It went on to acknowledge that the "potential danger that the jury might equate Feldman's contempt with a finding of his liability in the present suit and make determinations regarding the Rhode Island suit" is present, but it determined that "that [was] nothing a limiting instruction [could not] alleviate." When Feldman renewed his objection at trial, the court determined that the information presented at trial did not change the court's reasoning or conclusion in its ruling on the motion in limine. It also issued a limiting instruction in advance of Beaudoin's offer of the contempt evidence, instructing the jury that the evidence was to be used only in determining whether Feldman acted intentionally for purposes of the conversion claim and the punitive damages claim. And finally, when Feldman sought a new trial based on the admission of this evidence, the trial court once again reviewed and affirmed its reasoning and decision in its ruling to admit the evidence.

¶ 29. Feldman also suggests that the contempt-order evidence was inadmissible as improper character evidence under Rule 404. Although the evidence was offered for a permissible reason and the trial court gave an instruction to limit its use to that permissible purpose, Feldman argues that the trial court abused its discretion by essentially permitting Beaudoin to introduce the evidence to prove that Feldman acted in conformity with prior bad acts. In its ruling on Feldman's motion in limine, at trial, and in its post-judgment rulings, the trial court properly noted that Rule 404(b) permits evidence of prior bad acts to prove motive or intent, determined that that was the

14

purpose for which Beaudoin sought to introduce the evidence, weighed the probative value against its prejudicial effect, and decided that it was admissible with a limiting instruction.

¶ 30.   The record shows the trial court conducted an analysis of the challenged Rhode Island contempt ruling and determined that it was admissible.  Pursuant to the Rules of Evidence and this Court's requirements, the trial court determined that the evidence was relevant and admissible under Rules 401 and 402, weighed the relevance and probative value of the evidence against the prejudicial effect under Rule 403, and determined that it was admissible with an instruction limiting the jury's use in accordance with Rule 404(b).  It also determined that it was satisfied with the effectiveness of the limiting instruction after trial.  Therefore, the record before this Court does not show that the trial court " 'entirely withheld its discretion or that it exercised discretion for clearly untenable reasons or to a clearly untenable extent.' "  Jadallah v. Town of Fairfax, 2018 Vt. 34, __ Vt. __, __ A.3d __ (quoting Remes v. Nordic Grp., Inc., 169 Vt. 37, 39-40, 726 A.2d 77, 79 (1999).  Thus, the trial court did not abuse its broad discretion when it admitted evidence of the Rhode Island contempt order, and we find no error.[3]

B. Evidence of Beaudoin's Pre-2005 Tax Returns

¶ 31.   Second, Feldman argues that the trial court abused its discretion by granting Beaudoin's motion in limine, which it reaffirmed during trial and in its order on post-trial motions, thus prohibiting Feldman from introducing evidence of Beaudoin's pre-2005 tax returns.  We review for abuse of discretion as described above, and as such, we will not reverse the trial court's decision to exclude the evidence unless there is a showing that the court either totally withheld its

---

[3]   The trial court limited the jury's use of the evidence to the conversion claim and the punitive damages claim.  We need not reverse for the jury's consideration in an improper claim because we strike the punitive damages.  The jury was properly instructed to consider the evidence in the conversion claim, and our striking of punitive damages rectifies any other potential prejudicial effect of the evidence.

discretion or exercised "it in a clearly untenable or unreasonable fashion." Sweet v. Roy, 173 Vt. 418, 434, 801 A.2d 694, 706 (2002).

¶ 32.    Prior to trial through a motion in limine, Beaudoin sought to exclude his pre-2005 tax returns primarily because Feldman's payments to Beaudoin from 2005 through 2010 were the only payments that were at issue at trial—thus, the pre-2005 tax returns were irrelevant and inadmissible under Vermont Rules of Evidence 401 and 402.  Further, he argued that Feldman intended to introduce the evidence as impermissible character evidence under Rule 404(b)—to show that, because Beaudoin failed to report income on his pre-2005 tax returns, he was a dishonest person and could not be believed by the jury when he testified at trial.  Beaudoin went on to argue that even if the trial court found the evidence permissible under Rule 404(b), it was still inadmissible because it failed the Rule 403 balancing test—the prejudicial effect would significantly outweigh the limited probative value.  And finally, Beaudoin asserted that the pre-2005 tax returns were inadmissible for impeachment purposes because they were extrinsic evidence.  Feldman opposed Beaudoin's motion in limine, arguing that he sought to admit them for permissible reasons: to establish that Beaudoin did not receive a "salary" from Feldman; to prove that Feldman did not act with malice towards Beaudoin; and to eliminate any ambiguity as to the amount of money that was attributed as a loan repayment for capital contributions during the closing of the Colchester store.  Specifically, Feldman argued that Rule 404 did not exclude the evidence because: he was not offering it to prove conformity with a trait or act; several Rule 404 exceptions permit the introduction of character evidence for impeachment purposes; and the prejudicial effects of the pre-2005 tax returns did not substantially outweigh the probative value.

¶ 33.    In its ruling on the motion in limine, the trial court excluded the pre-2005 tax returns as irrelevant to the pertinent issue—whether the 2005-2010 payments from Feldman to Beaudoin were properly construed as loans or as salary.  It went on to hold that the extrinsic evidence of the pre-2005 tax returns was inadmissible for impeachment purposes.  See V.R.E. 608(b) ("Specific

16

instances of the conduct of a witness, for the purpose of attacking or supporting his credibility . . . may not be proved by extrinsic evidence.").

¶ 34. Feldman renewed his motion at trial and argued that the jury was entitled to know that Beaudoin failed to declare the payments on his pre-2005 tax returns because Beaudoin (1) introduced an exhibit showing that he received $1,790,000 from Feldman during the ten-year period ending in May 2010, (2) testified that from 2005 to 2010 he received $1,310,000, and (3) calculated, in response to a cross-examination question, that he received $480,000 between 2001 and 2004. The court reaffirmed its ruling on the motion in limine and maintained that the evidence should be excluded as irrelevant.

¶ 35. Finally, Feldman filed a motion for a new trial due to the exclusion of the evidence. In addition to reiterating his previous arguments, Feldman claimed that Beaudoin opened the door through his testimony and exhibits at trial that touched on the pre-2005 period. The trial court disagreed, noting that Beaudoin did not open the door through Feldman's cross-examination of him and that the parties clearly stipulated prior to trial that the introduction of the exhibits would not open the door to the admission of the pre-2005 tax returns.

¶ 36. "The party claiming an abuse of discretion bears the burden of showing that the trial court failed to carry out its duties." Gamache v. Smurro, 2006 VT 67, ¶ 21, 180 Vt. 113, 904 A.2d 91. It is the trial court's duty "to ensure a fair trial for both parties, conducted in an orderly and expeditious manner." Brown, 2018 VT 1, ¶ 20 (quotation omitted). "In the discharge of that responsibility, trial courts enjoy broad discretion in the admission or exclusion of evidence, and we review those decisions for an abuse of that discretion." Id. Feldman has not met this burden here.

¶ 37. In its order on the motion in limine, during trial, and in its order on the post-trial motions, the trial court addressed the arguments presented by Feldman, conducted a reasoned

17

analysis, and concluded that the evidence of Beaudoin's pre-2005 tax returns was inadmissible.[4] The trial court reasoned that the evidence was irrelevant because it was not relevant to the main issue—"whether the 2005-2010 payments from Feldman to Beaudoin were properly construed as loans or as salary." It found that whether Beaudoin reported payments from 1995 to 2004 on his tax returns would not have made it more or less probable that the disputed payments were income or loans. Additionally, the trial court noted that the total amount of money paid was not in dispute, so the tax returns would not offer any clarification because no clarification was seemingly needed. Further, when presented with Feldman's argument during trial and in his post-trial motions that the door was opened for the admission of the pre-2005 tax returns, the trial court concluded that the cross-examination of Beaudoin by Feldman and exhibits did not present any new information that would warrant a reversal of its ruling on the motion in limine. It further noted that the parties also "clearly stipulated prior to trial that exhibits . . . would not open the door to the admission of pre-2005 tax returns."

¶ 38. And finally, the trial court properly analyzed whether the evidence of the pre-2005 tax returns could have been admitted for the purpose of attacking Beaudoin's truthfulness under Rule 608(b). Rule 608(b) prohibits parties from using extrinsic evidence of "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility." It goes on to explain that extrinsic evidence of specific instances of conduct may be inquired into on cross-examination if, in the discretion of the trial court, they are found to be probative of truthfulness or untruthfulness. Id. Therefore, Feldman properly asserts that extrinsic evidence could be admissible in this situation—however, Rule 608(b) does not automatically require the admission

---

[4] Feldman argues before this Court that the pre-2005 tax returns were evidence of a plan of payments between Feldman and Beaudoin and therefore were admissible. See V.R.E. 404(b) (noting that evidence of other acts may "be admissible for other purposes, such as proof of . . . plan"). Because this argument was not presented below, it was not properly preserved for appeal. See Moreau v. Sylvester, 2014 VT 31, ¶ 8 n.2, 196 Vt. 183, 95 A.3d 416.

18

of such evidence. When presented with extrinsic evidence offered for impeachment purposes under Rule 608(b), "[d]iscretion lies with the court to weigh the probative value and prejudice to the witness of cross-examination on the prior conduct." State v. Davis, 165 Vt. 240, 250, 683 A.2d 1, 7 (1996); see also State v. Lawrence, 2013 VT 55, ¶¶ 6-7, 194 Vt. 315, 80 A.3d 58 (finding trial court had discretion to determine if extrinsic evidence offered for impeachment purposes on cross-examination was admissible). Here, in its order on the motion in limine, the court found the evidence of the pre-2005 tax returns to be irrelevant and excluded the evidence as impermissible extrinsic evidence pursuant to its discretionary authority under Rule 608(b). However, the trial court reserved its right to reconsider the ruling, contingent on whether Beaudoin "open[ed] the door by, for example, testifying about the 1995-2004 payments in a manner inconsistent with what the tax returns reflect." At trial and during its order on post-trial motions, it determined that, based on the scope of Beaudoin's testimony and the parties' stipulation that certain exhibits would not open the door, nothing was raised that required that it reconsider the exclusion.

¶ 39. This extensive analysis establishes that the trial court properly exercised its discretion, and that said discretion was not exercised in an entirely untenable or unreasonable way. It is not the role of this Court to overrule evidentiary rulings when it is clear that the trial court properly exercised its discretion throughout the proceedings below, and thus the trial court did not err in excluding Beaudoin's pre-2005 tax returns.

### C. Evidence of Feldman's Additional Real Estate Projects

¶ 40. Third, Feldman argues that the trial court abused its discretion by allowing Beaudoin to present evidence of Feldman's other real estate projects. At trial, Beaudoin's counsel called and questioned Feldman as an adverse witness about his projects in Massachusetts and New York. Feldman's counsel objected to the relevance of the evidence, and Beaudoin's counsel argued that the testimony was relevant to the size and scope of the projects and Beaudoin's experience in development. The trial court agreed with Beaudoin and overruled the objection, but

it limited Beaudoin's inquiry to the size and value of each project. When Feldman's counsel further objected and expressed concern over the status of these projects, some of which had been abandoned, Beaudoin's counsel suggested, and the trial court agreed, that Feldman would be available for cross-examination on that issue. Feldman renewed these objections through a motion for a new trial. The trial court affirmed its admission of the evidence.

¶ 41. On appeal, Feldman argues that the evidence was irrelevant and inadmissible. And even if it was relevant, Feldman posits that it should have been excluded under Rule 403 and Rule 404 because the prejudicial effect outweighed its probative value as it was offered to engender regional bias. The Court reviews evidentiary rulings for abuse of discretion.

¶ 42. First, we conclude that the trial court's determination that the evidence of the other projects' sizes was relevant was not an abuse of discretion. This Court has "stated that, in assessing punitive damages, the fact-finder must take into account the character and the standing of the party, the malice or wantonness of the party's conduct, and the party's financial status." Pion, 2003 VT 79, ¶ 44. Therefore, it was not an abuse of discretion to find that the general value of Feldman's other real estate developments went to the issue of Feldman's financial status and thus was relevant to accessing punitive damages.

¶ 43. Feldman then asserts that even if the evidence was relevant, it was inadmissible and improper because it was used to engender regional bias among the jury against Feldman, and thus a reversal and remand is justified because the probative value outweighed the prejudicial effect. " 'We agree that appeals to regional bias are inconsistent with notions of impartial justice.' " Obolensky v. Trombley, 2015 VT 34, ¶ 39, 198 Vt. 401, 115 A.3d 1016 (quoting Brown v. Roadway Express, Inc., 169 Vt. 633, 635, 740 A.2d 352, 356 (1999) (mem.)). This Court has also noted that regional bias is "a primary concern of federal courts hearing cases under diversity jurisdiction" and such grave concerns warranting reversal have not arisen in this Court's precedent. See Rathe Salvage, Inc. v. R. Brown & Sons, Inc., 2012 VT 18, ¶ 11 n. 2, 191 Vt. 284, 46 A.3d

20

891 (refusing to use stricter standard of review because grave concerns about blatant regional bias did not arise); see also Obolensky, 2015 VT 34, ¶ 39 (noting that Court takes claims of regional bias seriously but refusing to reverse because judges take oath of impartiality); Brown, 169 Vt. at 635 (concluding court did not abuse discretion "in refusing to give a more strongly-worded admonition to the jury"). With this in mind, we hold that evidence which is offered to engender blatant regional bias should not be permitted in our court system. Further, if evidence is offered for such a purpose, it is within the trial court's discretion to rectify the error by issuing a curative instruction or by imposing a sanction.

¶ 44. That being said, this Court need not determine whether the evidence of Feldman's other real estate projects was offered for the blatant purpose of engendering regional bias nor whether it resulted in prejudice in this case. Any resulting prejudice that may have occurred when this evidence was submitted to the jury for their consideration when determining punitive damages has been negated by striking such damages, as held above. Therefore, no reversal is warranted as a result of the admission of the evidence of Feldman's other real estate projects. Further, any bias engendered by the comments apparently did not infect the jury's award of compensatory damages, as they awarded the specific amount requested by Beaudoin.

III. Judgment as a Matter of Law and Indispensable Parties

¶ 45. Next, Feldman argues that the trial court erred when it denied his motion for judgment as a matter of law during trial and his renewed motion for judgment as a matter of law after trial under Vermont Rules of Civil Procedure 50(a) and 50(b), respectively.

¶ 46. At the close of Beaudoin's evidence at trial, Feldman moved for judgment as a matter of law under Rule 50. Rule 50 states that when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party . . . the court may determine the issue against that party and may grant a motion for judgment as a matter of law." Feldman argued that Beaudoin failed to join three parties—Feldman's wife,

21

Kalfeld Realty II, and Kalfeld Realty IV—that were indispensable as required by Vermont Rule of Civil Procedure 19(a) because they were partners to several of the corporate entities named as defendants. Rule 19 requires persons to be joined to an action (1) if, without that person, "complete relief cannot be accorded among those already parties" or (2) if the absent person either has "an interest relating to the subject of the action" and the disposition of the action without the person "may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the person's claimed interest." V.R.C.P. 19(a).

¶ 47. Feldman argued at trial and in his post-trial renewed motion that these parties were indispensable for each of the issues at trial. For the conversion and unjust enrichment charges, he claimed that Feldman did not, as a matter of law, receive the money but instead the corporate entities he was a member of did. For the breach-of-fiduciary-duty charge, Feldman argued that none of the named defendants were partners who owed a fiduciary duty to Beaudoin. Beaudoin opposed the motions, arguing that there was sufficient evidence before the jury to prove the claims asserted against the named defendants—Feldman, NEE-Colchester, and CMM. The court concluded at trial, and affirmed in its ruling on post-trial motions, that whether the additional parties could have been joined wasn't the issue for the motion—the true issue was whether Beaudoin "presented evidence upon which a jury could return a verdict" in his favor against Feldman for the charges of conversion, breach of fiduciary duty, and unjust enrichment. For the conversion and unjust-enrichment charges, it found that there was undisputed evidence that the money in question was in the possession of Feldman and his wife. For the breach-of-fiduciary-duty charge, the trial court determined that there was testimony supporting the conclusion that Feldman, through his control of NEELP-II, NEELP-IV, Kalfeld Realty II, and Kalfeld Realty IV,

owed a fiduciary duty to Beaudoin. Finding a sufficient evidentiary base, the trial court denied Feldman's motions.

¶ 48. When reviewing a denial of a motion for judgment as a matter of law under V.R.C.P. 50(b), this Court "must review all the evidence in the light most favorable to the nonmoving party, excluding the effect of any modifying evidence." Monahan v. GMAC Mortg. Corp., 2005 VT 110, ¶ 2, 179 Vt. 167, 893 A.2d 298. When a "defendant challenges the sufficiency of [a] plaintiff's evidence, we must determine whether the plaintiff has produced evidence that fairly and reasonably supports all elements of the disputed claims." Id. We will reverse only if "there is no legally sufficient basis for a reasonable jury to find for the nonmoving party." EWBS, LLC v. Britly Corp., 2007 VT 37, ¶ 7, 181 Vt. 513, 928 A.2d 497 (quotation omitted). When the evidence in the record "supports multiple reasonable inferences, we leave it for the jury to choose among them." Monahan, 2005 VT 110, ¶ 2.

¶ 49. Here, we conclude that the trial court correctly denied Feldman's motions for judgment as a matter of law. First, regarding the conversion and unjust-enrichment claims, the record reflects evidence that Feldman distributed funds of the Colchester-store sale to himself and his wife personally. This evidence creates a sufficient basis for the jury to determine that Feldman was personally liable for converting the funds and receiving unjust enrichment due to the sale of the Colchester store. For the breach-of-fiduciary-duties claim, evidence was presented that (1) Feldman and Beaudoin had an oral business agreement to develop projects and (2) Feldman controlled the Kalfeld entities, and by virtue of the corporate structure outlined above, also controlled the NEELP entities. Thus, there were at least two legally sufficient bases upon which the jury could determine that Feldman breached his fiduciary duty to Beaudoin.

¶ 50. The nature of the claims at issue in this case—conversion, unjust enrichment, and breach of fiduciary duty—and the evidence in the record make it clear that, while they could have been added, Feldman's wife, Kalfeld Realty II, and Kalfeld Realty IV were not indispensable

23

parties. If this case involved a breach of contract claim or another claim that relied heavily on specific corporate entities, instead of two individuals involved in a business conflict with significant personal undercurrents, the three parties may have been indispensable due to their potential corporate liability. But based on the claims asserted and evidence presented, Feldman has failed to establish that the three parties were needed to prevent an inconsistent or inadequate judgment under V.R.C.P. 19 or to show that Beaudoin had failed to present sufficient evidence to create a legal basis upon which the jury could find Feldman liable for the asserted claims. Thus, we affirm the trial court's denial of Feldman's motion for judgment as a matter of law.

### IV. New Trial, Closing Statement Remarks, and Completed Verdict Form

¶ 51. Lastly, Feldman argues that the trial court erred by not granting his motion for a new trial after Beaudoin's counsel asked the jury to "put yourselves" in the shoes of Beaudoin. Feldman posits that this type of questioning is so manifestly improper that it cannot be cured, and even if it could be cured, it was not cured here.

¶ 52. "A golden rule argument—which asks jurors to place themselves in the position of a party—is universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence." State v. Scales, 2017 VT 6, ¶ 28, 204 Vt. 137, 164 A.3d 652 (quotations omitted). This Court has long recognized statements like the one made by Beaudoin's counsel here as "highly improper" and "a lamentable departure from the rule which require[s] counsel to confine [his or her] argument to the evidence in the case and to the inferences properly to be drawn therefrom, and to avoid appealing to the prejudice of the jury." Duchaine v. Ray, 110 Vt. 313, 321, 6 A.2d 28, 32 (1939). However, even though golden-rule comments are "universally condemned," they are not per se grounds for a new trial or reversal. "Denials of motions for a new trial are reviewed under an abuse of discretion standard." Brown, 2018 VT 1, ¶ 33. Further, in the context of golden-rule violations, the Court will look to determine if prejudice resulted. Compare Duchaine, 110 Vt. at 321-22, 6 A.2d at 32

24

(holding that plaintiff's counsel's request for jury to " 'put [themselves] in the place of this plaintiff, and assess damages on that theory' " was "highly improper" but not prejudicial because, when considered against field of all evidence, jury's damages award was not "excessive"); with Scales, 2017 VT 6, ¶¶ 26-30 (holding that golden-rule violation resulted in prejudice based on "repeated improper remarks" showing "a studied purpose to arouse the prejudices of the jury" (quotation omitted)).

¶ 53.    Here, Feldman objected instantly after Beaudoin's counsel's golden-rule comment, the court sustained the objection and issued a curative instruction to the jury, and Beaudoin's counsel immediately moved on.  Feldman argues that Beaudoin's counsel's golden-rule comment was improper and that the trial court failed to cure it.  The court's instruction in response to Feldman's objection on its face in the transcript seems to suggest that the trial court affirmed Beaudoin's golden-rule comment instead correcting the violation: "Yes.  Ask them to put themselves in the same position."  However, in its order on post-trial motions, the trial court reviewed the audio recording of the trial and determined that the transcript was not accurate due to a microphone or other recording equipment garbling words.  It noted that "Two distinct, indecipherable sounds can be heard between the words 'Yes' and 'Ask.'  The court either said 'do not' or 'let's not' 'ask them to put themselves in the same position.' "  The trial court concluded that there had been no ambiguity and that it clearly had ordered Beaudoin's counsel not to continue with the golden-rule comment, "as evidenced by counsel's immediate response in moving on to a different subject."

¶ 54.    We conclude that, while Beaudoin's counsel's golden-rule comment was improper, the comment was appropriately cured, resulting in no prejudice, and thus we affirm the trial court's decision.  Based on the trial court's review of the audio recording and Beaudoin's counsel's immediate discontinuation of the golden-rule comment, we conclude that it was clear to the jury that the trial court was telling the jurors to disregard the comment.  Further, even if the immediate

25

curative instruction was not perfect, the instruction that was issued minutes later—"You may not base your decision on sympathy or prejudice. The attorneys have presented to you their different views of what the evidence shows. But what the attorneys say is not evidence. The evidence is the testimony you have heard and the exhibits that were admitted"—solidified the message to the jurors that they may not "put themselves in the shoes" of Beaudoin or base their decision on sympathy or prejudice.

¶ 55. Feldman also argues that the trial court should have granted his motion for a new trial after Beaudoin's counsel handed the jurors a sample verdict form with the requested award amount filled in. After Beaudoin's counsel handed the jury the sample form, Feldman immediately objected, and the court issued the following curative instruction: "So ladies and gentleman, a decision about your verdict is for you to make. This is only arguments by counsel. The evidence is what you've heard from the witness stand and the law is what I will tell you the law is." Beaudoin's counsel agreed, crossed out his writing on the sample form, and noted, "I'm not telling you that you have to put any numbers in. It's your determination what the number is." We hold that the court's curative instruction and Beaudoin's counsel's withdrawal of the comment were sufficient to correct any error that occurred. See Duchaine, 110 Vt. at 321, 6 A.2d at 32 (finding that "withdrawal [by counsel] and charge [by court] were sufficient to cure whatever mischief there may been in that portion of the argument").

The punitive damages award is stricken; in all other respects, the judgment is affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 56. **ROBINSON, J., dissenting.** The trial court's refusal to admit highly relevant evidence bearing on the critical issue in this case was not supported by its reasoning and exceeded

26

its discretion. I dissent from the majority's affirmance of the trial court's exclusion of evidence of Beaudoin's pre-2005 tax returns, and I would reverse.

¶ 57. As the majority rightly acknowledges, the core disputed issue in this case is whether the monthly payments Beaudoin received from 2005 through 2010 were personal loans or salary for the work he did. The lawfulness of Feldman's actions, and reasonable inferences concerning his malice or lack thereof, depend on the jury's resolution of this critical question. How Beaudoin accounted for the payments before the events giving rise to this case came to a head may be highly probative of his own understanding of the character of the payments. Evidence that Beaudoin did not account for the payments as salary in his tax returns, but instead treated them in a way that is consistent with Feldman's understanding that they were personal loans, could cast doubt on Beaudoin's claim that the payments were, in fact, salary. Evidence that makes the existence of a material fact more or less probable is relevant, V.R.E. 401, and relevant evidence is presumptively admissible, V.R.E. 402.[5]

¶ 58. The trial court's conclusion to the contrary rests on its assertion that whether Beaudoin reported payments on his tax returns from 1995 to 2004 doesn't make it more or less probable that the later payments, from 2005 to 2010, were loans or salary.[6] If there were a scintilla of evidence to suggest that something happened in 2005 that changed the character of the payments, this reasoning might have a toehold. But even the trial court described the payments to Beaudoin from 1995 to 2010 as part of a continuous course of conduct, explaining that "from 1995

---

[5] This theory of relevance, consistently advanced by Feldman before the trial court, is distinct from the theory against which Beaudoin directs most of his arguments. Feldman was not trying to show that Beaudoin lied on his tax returns before 2005 and therefore should not be believed with respect to the nature of the payments; instead, he was trying to show that Beaudoin treated the payments in a way that was inconsistent with his current position.

[6] The trial court did not conduct a V.R.E. 403 balancing of the probative value and prejudicial impact of the evidence, but instead rested its analysis solely on the assertion that the evidence had no probative value.

through 2010, Feldman apparently made regular payments to Beaudoin." The trial court stated, "The parties appear to dispute whether <u>those</u> payments constituted salary or a loan." (Emphasis added.)

¶ 59. There is little to no evidence to differentiate the character of the payments (i.e., loan versus salary) during any portion of the entire period of payments. In all likelihood, the payments from 1995 through 2010 were either all loans or all salary. Neither party has argued otherwise. Given this fact, evidence that Beaudoin took actions in 2004 that suggested that he understood the payments to be loans and not salary is probative with respect to his understanding of the nature of the payments in 2005 and beyond. Again, this is not a collateral issue—it's the core disputed issue in the case.

¶ 60. For these reasons, I cannot agree that the trial court's conclusion that the proffered evidence was irrelevant was within its broad discretion. I respectfully dissent.[7]

¶ 61. I am authorized to state that Chief Justice Reiber joins this dissent.

---

Associate Justice

---

[7] Because I would reverse on the grounds set forth above, I do not engage with the majority's analysis of punitive damages. I note, though, that the question of whether conduct is sufficiently flagrant to warrant punitive damages calls for factfinding that is informed by community judgments. <u>Fordham-Coleman v. Nat'l Fuel Gas Distribution Corp.</u>, 834 N.Y.S.2d 422, 429 (App. Div. 2007). For that reason, courts have recognized that "[a] jury is particularly well suited to the expression of community attitudes, and the decision whether to award punitive damages should reside in the sound discretion of the original trier of the facts." <u>Id</u>.